**Richmond.**

KENDALL BANK NOTE CO. v. COMMISSIONERS OF THE SINKING FUND.

November 20, 1884.

1. STATE BOARDS—*Contracts—Breach—Damages.*—Where a state board is authorized to cause the execution of a work, and makes a contract therefor, such contract is binding on the state. The rights of the contracting parties under it are the same as in other cases of the like kind, and the measure of damages for the breach of such contract is regulated by the settled rule on the subject, viz: that the plaintiff should have a fair compensation for all labor done, materials furnished and expenses incurred, together with such profits as he was likely to have realized as the direct and immediate fruits of the contract, had it been fulfilled.

2. IDEM—*Profits.*—Plaintiff is entitled to prospective profits when prevented from going on with the work by being ordered by the other party to desist, or by the latter's omission to perform some condition precedent to its further prosecution.

3. IDEM—*Plea.*—No opinion nor expectation of the defendant, not constituting part of the contract, can furnish him any plea of defence against an action for the breach of the contract.

Error to judgment of circuit court of city of Richmond, rendered 12th January, 1884, in an action of *assumpsit* brought by the Kendall Bank Note Company against the commissioners of the sinking fund of the state of Virginia, wherein a verdict and judgment were rendered against them in favor of the plaintiff for $30,000, and interest, &c. This action was instituted for damages accruing to plaintiff by reason of the defendant's breach of a contract made by them with plaintiff in April, 1882,

for the engraving and printing of certain bonds, coupons and certificates, under an act of the general assembly of Virginia, commonly known as the Riddleberger bill. To this judgment the commissioners obtained a writ of error and *supersedeas*. Opinion states the case.

*Attorney-General F. S. Blair*, for the plaintiffs in error.

*Edgar Allan*, for defendant in error.

LACY, J., delivered the opinion of the court:

In April, 1882, the plaintiffs in error entered into a contract with the defendants in error for the engraving and printing by them of the state bonds required by the act of assembly of February 14th, 1882, entitled "An act to ascertain and declare Virginia's share of the debt created before and actually existing at the time of the partition of her territory and resources," &c. The board of sinking fund commissioners advertised for bids for this work. Among other bids one was made by the defendants in error as follows:

"We will engrave the two sets of plates for $1,000 and $500, one hundred coupon bonds with separate steel plate printings in every part, that is, to-wit: face and back for body, and steel plate back and front for each sheet of coupons. Each set, $4,656. Engraving three sets of registered bonds, steel-plate throughout, that is, face, border and back, steel plates to each set, $2,650. Printing the bonds on the best bond paper made by the same mills as make the paper for the government bonds and of the same quality: coupon bonds, each, at 48 cents, registered bonds, each, at 14 cents. One thousand lithographed fractional certificates West Virginia, no charge.

"This bid contemplates the printing of each plate of each set in a different colored ink, or as desired by you, and the employment in the engraving of every science and art to prevent coun-

terfeiting.    This bid includes all requisite numberings you may desire, &c.    If accepted, a letter by you, stating the fact, addressed to 'The Kendall Bank Note Company,' will be regarded by us as sufficient evidence of the contract."

On the 20th of April, 1882, at a meeting of the board this bid was accepted, and on the 25th of April, following, a letter was addressed by the board to the Kendall Bank Note Company indicating such acceptance and requiring a bond to be executed by the bank note company in the penalty of $100,000. On the same day the bank note company agreed to give the bond of $100,000, which was duly given and accepted by the board on the day following.

The board sent its secretary to New York to superintend and direct the work in its behalf, and the work duly proceeded at as much speed as was possible with the employment of sufficient workmen to carry it forward night and day in order that the bonds might be ready by the 1st of July, following.

On the 15th of June the board requested a change of the figures on the bond, discarding a vignette heretofore agreed on and substituting another.    This the bank note company agreed to do without extra charge, but indicated that the change would require two weeks more time than would have been necessary without the change.

In the meantime, on the 17th of May, the board declined to make the advances in cash, requested by the company, of $10,000, but assured the company that the board was ready to carry out the contract, and to make payment promptly for the work contracted to be done as the same should be executed and approved by this board, saying : "this action is unanimous upon the part of the board, all the commissioners being present, and should relieve your company of all apprehension of annoyance in the execution of the contract and the collection therefor.

"The board will expect your company to give assurances at once of your ability to furnish bonds, &c., which will be received upon the stock board of New York."

The company undertook to comply with all the requirements of the stock exchange as to fixtures, buildings, &c.   The governor of the commonwealth, and the treasurer, employed a skilled detective to go to New York and investigate the affairs of the bank note company, who performed the services and made report: That the company did business in a fire proof building of modern construction; that the protection against fire and theft appeared to be amply sufficient for the requirements of the rules of the New York stock exchange; that the bond given by the company was good; that the company was in good standing; that they were amply able to do the work they had undertaken; that their work was of a superior quality, and that as soon as they complied with the requirements of the New York stock list committee, there was no reason why they could not fill the contract as well as any other company or individual. This report was received by the board of sinking fund commissioners with thanks, and the fee of the detective, of $150, paid.

A suit in equity was instituted, pending these proceedings, to enjoin the board from proceeding with this contract, by the attorney-general in the name of the commonwealth of Virginia, upon the ground that the company had attempted to procure the contract by offering to bribe one of the board.   And afterwards the bill was amended so as to charge the attempt at bribery as to all the members of the board.   Upon the answers of the members of the board, this suit was dismissed.

On the 16th of June, the company telegraphed to the board, saying: the desired changes should be made, and requesting immediate answer if the company should proceed accordingly. The board answered: " Make changes in vignettes, and let the work proceed under previous agreement."

The company sent part of the proofs on the 21st of June, and also on the 24th of June, and said that they could not furnish bonds before the second week in July; that the company was not losing a moment of time.

July 17th the secretary of the board telegraphed the company

that the package of bonds was received, but was not half enough to fill the first order for them.   By the 20th July three packages of bonds were received.   On that day the board met and considered the question of acceptance or rejection of the work done by the Kendall Bank Note Company.   The board met again the next day, having adjourned for the attendance of the attorney-general, and to give the company an opportunity to show cause why their contract should not be annulled.   On the 21st of July, at the meeting of the board, the counsel of the company appeared and requested that action be postponed until the president of the company could arrive, which he stated would probably be the next day.   The attorney-general urged immediate action.

The board, stating that it now appears that the work of the Kendall Bank Note Company has not been admitted to the stock exchange, and is, therefore, not negotiable on the stock markets of New York and London, passed the following resolution:

"*Resolved*, That the Virginia bonds, printed by the Kendall Bank Note Company, and this day received by the sinking fund commissioners, be, and the same are hereby ordered to be returned to the said company, and the contract, if such exists, be finally revoked."

A telegram was then sent to the American Bank Note Company to send an agent to Richmond to undertake the work of printing the required bonds, and a contract was subsequently awarded the American Bank Note Company to print the bonds of the state under the said act.

The Kendall Bank Note Company then protested that their work had been rejected without any just cause, and after full satisfaction had been expressed by the secretary in the bonds received, and gave notice that that company would appeal to the courts; and on the first Monday in August following, this suit was instituted by the said company against the said board, claiming $30,000 damages.   To this suit the board appeared, and filed the plea of *non assumpsit* and several special pleas,

four in number. The plaintiff replied to the plea of *non assumpsit*, and issue was joined. The plaintiff made special replication to pleas numbered two, three and four, and demurred to the plea numbered five. The demurrer was sustained by the court.

By their second plea the defendants set forth that by the act of assembly the bonds in question were required to be dated July 1st, 1882, and that the undertaking of the plaintiffs was, that the engraved bonds should be ready by the said time, and that they had failed to comply with their agreement in this respect, and did not have the bonds engraved in time. To this plea the plaintiffs replied, that the delay set forth in the said plea was due to the act of the defendants in making a change in the vignette to be printed on the bonds after the work was nearly completed.

By their third plea the defendants set forth that the express agreement was to have the bonds ready by the first of July, 1882, in which undertaking they had failed; and to this plea the plaintiffs replied as to the second plea, that the delay was caused by the said act on the part of the defendants in changing the form of the work when it was nearly completed.

By the fourth plea it was set forth that the defendants had undertaken and guaranteed that the plaintiff's house was a responsible and capable house, possessing the facilities necessary to print such bonds as should be listed at the New York stock exchange, and that this they undertook at their own risk, and that the bonds were never so listed and admitted on the stock exchange, and had printed the bonds before this was done without the consent of the defendants. To this plea the plaintiffs replied that they did not make any such agreement, and that they did not print the bonds without the consent and authority of the defendants, and that their loss did not proceed from their conduct but the default of the defendants.

By their fifth plea the defendants set forth that they had entered into the contract under a belief that the plaintiffs were

able to do the work, and that their work would be admitted on the stock list of the stock exchange, and that the same was not so admitted. To this plea the plaintiffs demurred, and the court sustained the demurrer.

At the trial the defendants moved the court to instruct the jury, first, that if they believed from the evidence that the plaintiffs agreed to execute the work within a specified time, and failed, that they should find for the defendants.

Secondly. That if the bonds were to be ready by a specified time and admitted to the stock exchange, and had failed in this, then they should find for the defendants.

Thirdly. That if they believed that, by the contract, the work was to be caused by the plaintiffs to be admitted to the stock exchange, and that the plaintiffs had not caused it to be so admitted, they must find for the defendants.

Fourthly. That if the jury believed from the evidence that it was expressly agreed between the parties that the plaintiffs had agreed that within a certain specified time the said bonds should be approved by and admitted to the stock exchange of New York, and that this was not done, then they should find for the defendants.

Fifthly. That the measure of damages, if the plaintiffs should be found entitled to recover, was the actual damages they have sustained.

Sixthly. That in estimating these damages the jury should consider the work done, materials used, and the moneys laid out, and this with interest would constitute the measure of damages in the case and the extent of the plaintiff's recovery.

Seventhly. That no allowance could be made for speculative damages, as if the contract had been fully carried out.

The court gave the fourth instruction of the defendants, and in lieu of the other instructions asked by them instructed the jury that if they believed from the evidence that the contract had been that the bonds should be ready by a certain day, and it was not so ready, they should find for the defendants, unless

they should further believe that the delay was occasioned by or agreed to by the defendants ; and that upon the measure of damages, if the jury should find the plaintiffs entitled to damages, then the actual damages incurred should be allowed, and, in addition, if the jury believed that the plaintiffs would have realized a profit if they had been permitted to execute the contract according to the terms agreed upon, they should further allow such profits, with interest at six per cent., in their discretion. And at the request of the plaintiffs gave certain instructions offered by them, substantially such as are recited above as given by the court. The defendants excepted to the giving of all the instructions given by the court except their own fourth instruction, and to the ruling of the court in rejecting their instructions offered by them and refused by the court. Upon the trial the jury found for the plaintiffs, and assessed their damages at $30,000. The defendants moved the court to set aside the verdict of the jury and grant them a new trial, which motion the court overruled and entered judgment accordingly, and the defendants again excepted. Whereupon, the defendants applied to this court for a writ of error and *supersedeas*, which was awarded on the 29th day of March, 1884.

In this case the court has certified the facts proved, which are in accordance with the foregoing statement of the case. It is proved that the plaintiffs in error did contract with the defendants in error to print the bonds in question at an agreed price, also that the work was done, and there is no pretence that there was any defect in the quality of the work. The contract was rescinded upon the ground that the bonds were not ready by the 1st of July, when they were needed, but it is shown that the work was in a state of advancement which promised a speedy completion, and within the required time, when, by the act of the plaintiffs in error, it was delayed by alterations ordered at a late day in the transactions, and the delay is not only fairly attributable to that alteration and change of plan, but it is clearly proved that the delay was due to the act of the plaintiffs

in error and to that alone, and it certainly did not hasten the execution of the bonds to reject large numbers already finished and employ another company to commence then and do the work at that date.

The other, and apparently the chief ground upon which the contract was annulled was, that the work of this company had not been listed on the stock exchange. In the first place, when the contract was made, there was no agreement between the parties upon this subject. It was agreed that the company should do fine and acceptable work; that the responsibility and respectability of the company should be considered, and their facilities for executing the work suitable, and their work all that was required, and to secure them the company executed a bond with full and sufficient security in the penalty of $100,000. This was the guarantee selected by the board, and it appears to have been ample to cover all loss which could accrue from any defect in the execution of the contract on the part of the company. Without inspecting, however, the work which they had caused to be executed at such cost, without giving the company an opportunity to be heard, without offering the bonds at the stock exchange to be listed, and testing in that or any other way the question whether they would be so listed when so offered, notwithstanding the assurance of the confidential agent sent to investigate the matter, the contract was rescinded, broken on the part of one of the contracting parties, and the bonds returned to the engraving company, and forthwith another contract made with another bank note company. · Can it be said that the bonds would not have been listed at the stock exchange had they been presented there? There is certainly no evidence in this case which shows it.

If, then, the Kendall Bank Note Company did perform its part of the contract, can that company be denied the agreed compensation which they had contracted for, because, when the work was all completed, or nearly so, the other party refused to comply on its part?

The board was authorized by law to cause the execution of this work, and their contract is binding upon the state, and the rights of the contracting parties the same as in other cases of like kind, and the question of damages is governed by the well settled rule of law on that subject. The circuit court instructed the jury, as we have seen, that if they believe from the evidence that the plaintiffs were entitled to a verdict against the defendants, by reason of a breach, by the defendants, of the contract sued on, then said verdict should be for the amount of the actual damages sustained by the plaintiffs; and in ascertaining such actual damages, the jury should allow the plaintiffs a fair and reasonable compensation for all work and labor performed, for materials used, and the repayment of all moneys expended by them on account of the said defendants in the execution and performance of the said contract; and if the jury shall believe from all the evidence that the said plaintiffs would have realized a profit if they had been permitted to execute the contract according to the terms agreed upon, they should further allow the plaintiffs, as a part of their damages, the amount of such profit, and this, with interest at six per cent., in the discretion of the jury, should be the measure of such damages.

There are many cases in which the profit to be made by the bargain is the only thing purchased, and in such cases the amount of such profit is strictly the measure of damages. Wood's Mayne on Damages, p. 82. It has been held that when the defendants refused to allow the contract to be executed, that the jury should allow the plaintiffs as much as the performance of the contract would have benefited them. Profits or advantages, which are the direct and immediate fruits of the contract entered into between the parties, are part and parcel of the contract itself, entering into and constituting a portion of its very elements—something stipulated for, and the right to the enjoyment of which is just as clear and plain as to the fulfillment of any other stipulation. They are presumed to have been taken into consideration, and deliberated upon before the contract

was made, and formed, perhaps, the only inducement to the arrangement. *Masterton* v. *Mayor of Brooklyn,* 7 Hill (N. Y.), 62.

The plaintiffs can recover for prospective profits when they are prevented from going on by being ordered to desist from the work, or by the omission to perform some condition precedent to its further prosecution by the other party. See *The County of Christian* v. *Overholt,* 18 Ill. 223; *Palm* v. *The Ohio & Mississippi R. R. Co.,* 18 Ill. 217.

The measure of damages, when a party has not fulfilledh is contract, is what might be reasonably expected in the ordinary course of things to flow from its execution, not more than that, but what might be reasonably expected to flow from the non-fulfillment of the contract in the ordinary state of things, and to be the natural consequences of it. See *Cory* v. *Thames Iron Works Co.,* 3 Queen's Bench, 181; *Hadley* v. *Baxendale,* 9 Exch. 341.

The rule is, that you are to endeavor to ascertain the real amount of damages that the plaintiff has sustained; and it is just and reasonable that the defendant should make good this amount; he must pay it; provided, that if he had no notice of any circumstance which makes the plaintiff's loss greater than it ordinarily would be he cannot be called upon to pay this extra damage. The plaintiffs can only recover such damages as are the natural result of the breach of the contract in ordinary circumstances, such as were in the contemplation of both parties at the time of the contract. The circuit court having so instructed the jury in this case, such instructions are right, and not erroneous. In the other instructions of the court we can perceive no error. If there was a failure to complete the work by any agreed time, the plaintiffs could not recover unless such failure was caused by the act of the defendants. If the delay was caused by the act of the defendants, they cannot complain of and hold the plaintiffs responsible for their own act.

The court did not err in sustaining the demurrer to the fifth plea of the defendants; any opinion or expectation of the defend-

ants entertained at the time of the execution of the contract, which did not enter into nor constitute any part of the contract, and of which the other contracting party had no notice, can constitute no ground of defence to the action for breach of the contract.

We perceive no error in the judgment of the circuit court, and upon the whole case we are of opinion to affirm the judgment of that court. When the sacredness of contracts fairly entered into shall be disregarded, under any pretence, there will be an end of all confidence and protection of persons or property. And when a contract is broken up without a cause it places the injured party on the same grounds, in regard to an action for damages, as if he had performed the contract. The responsibility is thrown upon the wrong doer, and if he be a public servant the public must suffer. Our government is founded upon the theory that the people will protect their own interests by electing to places of trust faithful and capable men. The plaintiffs are entitled to compensation for the work done and the materials procured at the time they were discharged from the contract. And they are entitled to damages which shall cover the profits on their work had it been completed. See the case of *Cook & Cook* v. *Commissioners of Hamilton County*, 6th McLean's Rep. 617.

The judgment of the court is right and must be affirmed.

JUDGMENT AFFIRMED.