## CHARLESTON.

VIRGINIAN EXPORT COAL COMPANY *v.* ROWLAND LAND
COMPANY.

(No. 5008)

Submitted March 17, 1925. Decided January 13, 1926.

1. CONTRACTS—*Default in Contract Fairly Entered Into by
   Parties, Sui Juris for Purposes Not Immoral, Unlawful,
   or Impossible of Performance is Not Excusable.*

   Though the obligations of a contract do not inhere or sub-
   sist in the agreement *proprio vigore,* the law so regards con-
   tracts and attaches to them such sanctity that, when fairly
   entered into by parties *sui juris* for purposes not immoral,
   unlawful or impossible of performance, it will not excuse
   non-compliance with the unconditional and unqualified terms
   of the undertaking. It requires both parties to be faithful
   to their covenants. If they have made no provision for a
   dispensation, the law gives none. (p. 577.)

   (Contracts, 13 C. J. 706.)

2. SAME—*Contract Should Provide Against Contingencies Which
   May Render Difficult, or Prevent, Performance.*

   It is the duty of contracting parties to provide against
   contingencies, as they are presumed to know whether the
   completion of the duty they undertake be within their power.
   (p. 577.)

   (Contracts, 13 C. J. 706.)

3. SAME—*Right of Election of Promisor to do One of Two
   Things by Given Day is Lost if Such Day Passes Without
   His Election, and Right of Election is Thereafter in Party
   to Whom Promise is to be Performed.*

   The law is that, where the promisor has the right to do
   one of two things by a given day, his right of election is

lost if that day passes without his election, and the right of
election is thereafter in the party to whom the promise is
to be performed.    (p. 578.)

(Contracts, 13 C. J. 706.)

4.  SAME—*Care Should be Taken in Construing Correspondence
    Not to Construe as Agreement What Parties Intended to
    be Preliminary Negotiations; Method of Determining
    Whether Parties by Correspondence Intended to Make
    Contract Stated; Intention of Parties to Make Contract
    by Correspondence Must be Determined From Circum-
    stances and Surroundings of Each Case.*

    While a valid contract may be made between parties by
    memorandum, telegrams and correspondence, care should be
    taken not to construe as an agreement that which the parties
    only intended to be a preliminary negotiation. The question
    in such cases is, did the parties mean to contract by the
    memorandum of agreement, or were they only settling the
    terms of an agreement into which they proposed to enter
    after all its particulars were adjusted, which was then to
    be formally drawn up, and by which alone they designed to
    be bound? Such intention must necessarily be determined
    from the circumstances and surroundings appearing in each
    particular case.    (p. 580.)

    (Contracts, 13 C. J. §§ 100, 114.)

5.  SAME—*Fundamentals of Legal "Contract" Stated; Meeting
    of Minds Essential.*

    The fundamentals of a legal contract are competent par-
    ties, legal subject matter, valuable consideration and mutual
    assent. There can be no contract if there is one of these
    essential elements upon which the minds of the parties are
    not in agreement.    (p. 579.)

    (Contracts, 13 C. J. §§ 44, 46, 145, 166, 339.)

6.  MINES AND MINERALS—*Evidence Held to Show That Nego-
    tiations and Dealings of Parties Were Based on Consum-
    mation of Lease to be Subsequently Executed Causing
    Failure to Execute Such Agreement to Nullify Prelim-
    inary Promises.*

    Evidence in this suit *held* to show that the negotiations
    and dealings of the parties, concerning which the Bellevue-
    Stratford memorandum dealt, were based on the consum-
    mation of a lease to be subsequently executed and signed
    by the parties, and the failure to bring about such enforce-
    able agreement for the completion of the whole object of such

negotiation nullified the preliminary promises, which were interdependent. (p. 580.)

(Mines and Minerals, 27 Cyc. p. 692 [Anno]).

(NOTE: Parenthetical references by Editors, C. J.—Cyc. Not part of syllabi.)

Appeal from Circuit Court, Kanawha County.

Suit for injunction by the Virginian Export Coal Company against the Rowland Land Company. From the judgment of dismissal, plaintiff appeals.

*Affirmed.*

*Robinson, Warder & Robinson, Poffenbarger, Blue & Dayton,* and *Price, Smith & Spilman,* for appellant.

*Brown, Jackson & Knight, Benj. B. Brown* and *Harold A. Ritz,* for appellee.

WOODS, JUDGE:

This suit was instituted for the purpose of enjoining an action at law brought by the Rowland Land Company against the Virginian Export Coal Company to recover unpaid royalties and taxes accruing under a lease, bearing date of February 23, 1918, on 13,600 acres of coal land, situate in Raleigh County. The circuit court of Kanawha county, on the hearing, denied the relief sought by the Virginian Export Coal Company, and dismissed its bill. From this ruling the plaintiff appeals.

To a proper understanding of the controversy it is necessary to set forth somewhat in detail the allegations of the bill and answer.

The substantial allegations in the bill are as follows: That prior to February 23, 1918, Elias M. Poston, of Columbus, Ohio, who was then and still is, president of the New York Coal Company, entered into negotiations with S. C. Rowland, of Baltimore, Maryland, and J. Roman Way of Williamsport, Pennsylvania, who then were and still are, vice-president and president, respectively, of the Rowland Land Company, owning and controlling a majority of the stock thereof, for a lease from the Rowland Land Company for coal mining

purposes for a tract of land owned by it in Raleigh County containing 13,600 acres, including part of a tract known as its "Lease 15"; that pursuant to such negotiations it was agreed between the parties that said Poston and T. E. B. Siler, of Charleston, West Virginia, should cause a corporation to be organized under the laws of this state, for the purpose of taking said lease, and that Poston and Siler and their associates should subscribe $500,000.00 par value of the capital stock of such corporation; that, thereupon, the plaintiff, Virginian Export Coal Company, was chartered under the laws of this state, with an authorized capital of $1,000,000, Poston and Siler associating with themselves, J. L. Murphy, chief engineer of the New York Coal Company, Matthew Slush and James P. Cummiskey, who were associated with Siler in other coal mining enterprises; that these five subscribed for practically all of the capital stock; that upon an organization of the company, the Rowland Land Company executed and delivered a coal mining lease for the aforesaid property; that at the time said lease was made it was understood between the parties thereto that in order to operate the leased premises successfully it would be necessary for the lessee to make proper arrangements with the Virginian Railway Company, whose line was then constructed to a point within five miles of the leased premises, for the connection and operation of a railroad connecting said premises with said line of said railroad, and there was attached to said lease a written stipulation or agreement, signed by the attorneys for each party to said lease, to the effect that if said lessee should be prevented by reason of anything contained in the twenty-first clause of said lease, requiring the lessee to give preference to the Chesapeake & Ohio Railway Company in all traffic coming to or going from the demised premises, or by reason of any contract or relation existing between the Rowland Land Company, and the said Chesapeake and Ohio Railway Company, the lessee should have the right within ninety days to surrender said lease. The plaintiff further avers that before negotiations were concluded for the lease it had a tentative promise from the Virginian Railway Company to build

such spur track, and the Chesapeake & Ohio Railway Company, providing for the delivery by the latter over its tracks, of cars to be used in shipping coal; that this plan was frustrated by the death of the president of the Chesapeake & Ohio Railway Company, a few days after the lease was executed; that the effort to secure the needed railroad facilities, by connection with the Virginian Railway Company, was blocked by the failure to secure the consent of the United States Government to the construction thereof, as at that time the Government was controlling and operating all interstate carriers, including the said Virginian Railway Company. The plaintiff further avers that because of such refusal and of the inability of the lessee to obtain access to the line of the Virginian Railway Company, the right of the lessee to surrender the lease was recognized by the lessor, and the time for the commencing mining operations under said lease, and for the payment of royalties, was extended by the Rowland Land Company, from time to time, until September 3, 1920, at a meeting at the Waldorf Hotel in New York, at which Poston, acting as the agent of the New York Coal Company, Siler, and also for the Virginian Export Coal Company, and S. C. Rowland, acting as agent for the Rowland Land Company, a memorandum option was agreed upon for a new lease, to the effect that the Rowland Land Company would give to Siler and Poston the option or right to lease the land included in the old lease of February 18, 1918, and about 6,300 acres in addition thereto, which would furnish access to the railroad of the Chesapeake & Ohio, at certain royalties, minimum rental and terms agreed upon between the parties; and that, if the New York Coal Company and Siler exercised said option to take said new lease, the old lease should thereupon become terminated and no longer binding upon the parties. The plaintiff further avers the payment of $2,500, on September 28, 1920, and $2,500, on October 30, 1920, due under said option and that the Rowland Land Company agreed to an extension of time for the payment of minimum royalty under the old lease, on account of the recognized inability of the plaintiff to obtain connection with the Virginian Railway Company; that after considerable correspondence between

Poston, on the one hand, and Way and Rowland, on the other, these three parties met in New York on the 13th of December, 1920, and, after a full consideration and discussion of the new proposition, Poston and Siler accepted said option of September 3, 1920, and agreed to take said new lease, and that it was agreed between Rowland and Way representing the Rowland Land Company, Poston and Siler representing the Virginian Export Coal Company, and the said Siler and New York Coal Company, that the said lease of February 23, 1918, was terminated, surrendered and rescinded, and that the Rowland Land Company should lease to the New York Coal Company, or such lessee as it should nominate, effective as of January 1, 1921, said 13,600 acres formerly leased, as aforesaid, and the said 6,300 acres in addition thereto, upon certain terms agreed to between the parties, namely: (1) The term of said lease to be either for thirty years, with a renewal provision for a further term of thirty years, or for fifty years without renewal. (2) The royalty was to be 10 cents per net ton of 2,000 pounds, payable quarterly—instead of the royalty of 8½ cents, provided in said old lease of February 23, 1918. (3) The lease to contain no obligation on the part of the lessee to commence work thereunder at any specified time—but (4) In lieu of commencing operations and mining coal and paying royalty thereon, the lessee to pay rental or minimum royalty as follows, payable quarterly: For the year 1921—$20,000; for the year 1922—$40,000; for the year 1923—$45,000; for the year 1924 and each year thereafter—$60,000, the royalty on all coal mined at 10 cents a ton to be credited on said minimum payments. (5) The lease to contain the customary provisions relating to abatement of minimum royalty in case of strikes, such exceptions, however, to be effective only after the mining of coal had been commenced. (6) It was agreed that the sum of $10,000 paid under the option of September 3, 1920, above referred to (including the two monthly payments of $2,500 for September and October theretofore paid as above set forth, and the further sum of $5,000 paid as below stated), was to be accepted by the Rowland Land Company and applied in payment of the first two quarterly payments of minimum

rentals, becoming due April 25th and July 25, 1921, under said agreement. (7) The lessee was to pay taxes on the mineral or coal in the leased premises (including said 13,600 acres formerly leased to said Virginian Export Coal Company) and on the improvements placed thereon by the lessee. commencing with the year 1921. (8) The lessee was to have the right, from time to time, to sub-divide and sub-lease said 19,900 acres in such manner as it might desire and deem advisable, it being further understood that said lessee did not intend itself to operate said premises, but to act as a holding and leasing company. (9) The lessee to have the right to use all timber which the lessor owned upon said premises below a specified size, for mining purposes. (10) The lessee and the lessor jointly to have the right to use and occupy the hotel and hotel property of the lessor situate at Colcord. (11) The lessee to have the right to haul through or over the leased premises without charge coal from other lands of the lessee. It is further agreed that if the said lease was not made to the New York Coal Company, then the performance thereof by any other lessee to whom it should be made was to be guaranteed by said company, which, plaintiff avers, was known to said Rowland and Way, to be responsible and solvent, a lease containing the terms agreed upon was to be prepared by Rowland and Way and submitted to Siler and the New York Coal Company for execution as soon as practicable. The plaintiff further avers that Poston, after returning to his home in Columbus, on December 29, 1920, reduced to writing and put in the form of a letter addressed to Rowland and Way jointly, the agreement arrived at in New York as above set out, enclosing the check of the New York Coal Company to the order of the Rowland Land Company for $14,275.38, of which $5,000 was in payment of the balance of the option money due under said option of September 3, 1920, and applied to the payment of minimum rental accruing under said agreement as above set out, and the balance of $9,275.38 was in payment of taxes on the 13,600 acres embraced in the former lease; that Rowland Land Company, by J. Roman Way, president, by letter dated January 4, 1921, acknowledged the receipt of said letter and of the check, stating that

the memorandum contained therein was in the main correct but that there were a few points mentioned therein, which, while not discussed at said New York meeting, he thought could be satisfactorily adjusted, namely, with respect to the time limit for starting operations, sub-leasing, the haulage of coal from other property and the use of the hotel property at Colcord, and further stating that the engineer of the Rowland Land Company would prepare a description "of all the land covered by lease to Virginian Export Coal Company, and lease 16 and remainder of No. 15, and have it ready to insert in a new lease covering both properties, which we will have our attorney prepare as soon as possible, leaving the name of the lessee blank until you are ready to sign it." Plaintiff further avers that after further correspondence by letter and telegram between Rowland and Poston they met by appointment at the Bellevue-Stratford Hotel in Philadelphia on January 27, 1921, and then and there reached an agreement as to all matters left open with respect to the terms of said lease, including the questions of time limit for starting operations, sub-leasing, and hauling of other coal through the leased premises and the use of said hotel property, and that said agreement, was then and there reduced to writing by said parties and signed by said Poston, as the agent of the New York Coal Company and Siler, and of the Virginian Export Coal Company, and by the said Way and Rowland as the agents of said Rowland Land Company, one or more of said signed drafts being retained by each of said parties, whereby it was understood and agreed that the terms in said letter of December 29, 1920, from the said Poston to the said Rowland and Way, as supplemented and modified by said writing of January 27, 1921, should constitute the terms and provisions agreed upon between the said Siler and New York Coal Company, and the Virginian Export Coal Company and the Rowland Land Company, for the lease by the latter to the former, or to such lessee as they should designate, of said 19,900 acres of land. The agreement referred to is as follows:

"Bellevue-Stratford, Philadelphia, January 27, 1921. Present: E. M. Poston, J. Roman Way and

S. C. Rowland. (1) Term of lease—30 years with
option to renew for 30 years additional. (2) No
time definite in which to begin mining operations,
but lessee is not to have right to recover coal for
any prepaid royalties after seven years. (3) Les-
see to pay taxes on coal and on improvements
placed on lease by them. (4) Guaranty of New
York Coal Co. to be satisfactory to Attorneys of
lessor. (5) Lessee to have the property at Colcord,
except the lessor reserves hotel and two acres of
land, or if lessee desires to take over the hotel,
two rooms to be maintained at disposal of lessor, or
lessor in lieu thereof to use two acres of said land
at their option. No sale of Colcord property to be
made by lessor during term of lease except to les-
see. (6) Lessee to have rights as to hauling with-
out cost through leased property any coal here-
after acquired on waters of either Clear Fork or
Marsh ·Fork of Coal River and tributaries. Lessor
to have the option to take over at cost from lessee
any after-acquired coal property or rights of way,
but same to be added to the lease and governed by
the conditions thereof. (Signed) E. M. Poston, J.
Roman Way, S. C. Rowland."

The plaintiff further avers that the attorneys for the New
York Coal Company prepared a draft and also a written
guaranty of the New York Coal Company, copies of which
were submitted to said Way on June 29, 1921, and that the
said Rowland informed the said Poston shortly thereafter that
his attorney had made certain objections to the draft of lease
but that as Rowland and Poston had agreed on all matters
affecting the lease, and eliminated all differences between them
as to its terms, a conference would be held for the purpose
of having their respective attorneys whip the papers into
shape, to which Poston agreed; that by reason of Rowland be-
ing in Europe during part of the summer, and because of
engagements of Poston, as chairman of a committee of cred-
itors charged with the reorganization of the Inter-State Coal
and Dock Company, which involved litigation and transac-
tions with respect to the property and business of said com-
pany in several states, and also on account of strikes occur-

ring at the mines under the management of said Poston, a meeting was not held of the parties and their attorneys until the 30th day of December, 1921, at which the drafts of the leases were discussed; that thereafter a meeting was held in New York on February 24, 1922, at which the terms of said lease were further discussed and the subdivision of the 19,900 acres into sub-leases was referred to the respective engineers of the Rowland Land Company and the New York Coal Company for their consideration and report. Another meeting was held on March 30, 1922, in New York, but just before that date Poston found that it would be impossible to leave his home in Columbus, and come to New York for the purpose of attending said meeting, and he asked through his counsel Judge Pendleton to have said conference postponed a few days; that this request was denied and Mr. Knight, counsel for Rowland Land Company, stated that he was instructed to inform Judge Pendleton as the representative of New York Coal Company and Siler, that the Rowland Land Company was not disposed to discuss farther the making of said lease for 19,900 acres, and that they claimed the right to make any disposition of the new territory of 6,300 acres, that they saw fit and would insist and claim that the old lease of February 23, 1918, to the Virginian Export Coal Company was in force and effect; that to this statement Judge Pendleton replied, that ''as they knew, Poston claimed that the old lease was abrogated and that it only remained now to carry out said agreement for the new lease, and further that the New York Coal Company had paid the sum of $10,000.00 in payment of minimum royalty upon the said 19,900 acres for the first two quarters accruing under said new lease, and taxes to the amount of $9,275.38 on the 13,600 acres embraced in the old lease, in part performance of said contract of January 27, 1921, and that said Poston was insisting upon a compliance with said agreement;'' that the Rowland Land Company through its attorney declined to recognize said agreement and considered that the old lease was still in existence and proposed to see that it was complied with; that demand was made by it for payment of royalties under the old lease for the years 1920 and 1921, and for taxes for the year 1921, on re-

fusal of the Virginian Export Coal Company to comply with its demand, the Rowland Land Company instituted its suit in the circuit court of Kanawha county to recover the same. Thereupon the Virginian Export Coal Company filed a bill in equity setting out the facts as stated aforesaid, avering in addition thereto, that. at all times prior to the repudiation and breach of said agreement of January 27, 1921, by the Rowland Land Company on the 30th day of March, 1922, the said Siler and New York Coal Company were ready, willing, anxious and able fully to perform, comply with and carry out all terms, covenants and, obligations of said agreement binding upon them, all of which was well known to the defendant Rowland Land Company, and that the violation and repudiation of said agreement by the defendant was without just cause or excuse. That the old lease was entered into under a mutual mistake of fact, namely, that both parties believed at the time it was made that Virginian Export Coal Company would be able to obtain a connection with the Virginian Railway Company, and had it not been for the negotiations had between the plaintiff and the defendant looking to the making of a new lease, the plaintiff would have surrendered and cancelled said lease within the ninety-day period. The plaintiff therefore asked that the Rowland Land Company be enjoined from further prosecuting its action at law against it, as well as all suits based upon the lease of February 23, 1918, and that said old lease be decreed to have been terminated, rescinded and surrendered by said agreement of January 27, 1921, and delivered up to plaintiff for cancellation.

The defendant's answer denies that it was recognized and understood between the parties at the time of the negotiations that in order to operate the premises successfully it would be necessary for the lessee to make any arrangements with the Virginian Railway Company for the connection and operation of a railroad connecting the said premises with the said line of said railway company; that it is true that said Poston and Siler did consider such a connection desirable and did expect to secure the same, but that there was never any agreement or understanding that the lease should be in any wise

affected should they be unable to secure such connection unless such failure was because of the things referred to in the memorandum or stipulation attached to the lease. By the memorandum it is agreed that if such connection could not be secured because of the provisions in paragraph 21 of the lease providing that the Chesapeake & Ohio Railway should have the preference in handling the traffic when all other conditions were equal, the said defendant would have the right to cancel said lease within ninety days, but. this defendant says that there was never any difficulty because of the matter referred to in this stipulation in the lease and that plaintiff never surrendered, nor offered to surrender said lease, within ninety days or within any other time. The defendant denies that it was in any way responsible for the failure to secure said railway connection. It says that while it was true that it did offer to consider a proposal of the extension of time for the payment of royalties if the said plaintiff would make a proper proposal in writing, yet it did not. do so, except upon condition that Poston be relieved from his subscription to the stock of the plaintiff, and that this defendant refused to consider this proposal upon any terms. The defendant says that there were no negotiations for the lease of additional territory for more than two years after making of the lease to the plaintiff herein. Such proposal was made by Poston on the 3rd day of September, 1920. By the memorandum made at this time there was no proposal to lease any of the lands theretofore leased to the plaintiff but only a part of the lands owned by this defendant not included in the plaintiff's former lease. It is true that this proposal was verbally accepted on behalf of the defendant and all parties interested treated it as an option to lease the said 6,300 acres to the said Poston and as a consideration the said Poston was to pay $2,500 a month until he accepted the same or until the first day of January, 1921, and the same should expire if not theretofore accepted. The defendant avers that it was at a conference on December 13, 1920, for the first time, any desire was expressed, to include the land of the old lease, and that the payment of $10,000 was made in accordance with the agreement of September 3,

1920, for the option of 6,300 acres, and for no other purpose. The defendant admits the conference at the Bellevue-Stratford Hotel and the truth of the memorandum of agreement set out in plaintiff's bill, but says though the result of said conference was reduced to writing and signed by the parties, this defendant denies that the parties agreed upon all matters to be contained in said lease or that the said writing signed at that time together with the letter of December 29th, should constitute a contract between them, but, on the other hand, avers that it was always the agreement and understanding between the parties that no binding or valid contract should exist until all of the understandings and agreements were reduced to writing in the form of a lease under seal and executed and delivered to the parties. The defendant further avers that it was not until the receipt of the letter of December 29, 1920, from the said Poston, that the said Poston undertook to close the transaction for himself and his associates, and that said letter was not an acceptance made by it at the meeting theretofore held in the month of December, but even if it was, still such proposals were never made in writing and the same could not constitute a valid and binding contract for the lease of land for more than one year because in violation of the statute of frauds, which is here pleaded and relied upon. That defendant denies that a complete agreement between the parties was reached at the conference at the Bellevue-Stratford Hotel on January 27, 1921; that no agreement was arrived at upon the matters mentioned in the letter of December 29th, and January 4, as to sub-leasing and also failed to agree as to how the performance of the covenants on the part of the lessee should be guaranteed, nor was there any agreement as to who should be the lessee in said lease. The defendant further avers that it caused its counsel to prepare a lease embodying the matters already agreed upon and also its desires as to matters in disagreement, leaving the name of the lessee blank, and sent it to Poston in February, 1921, for his examination; that many changes were desired by the said Poston as to matters of sub-leasing and to the manner of operating the same, as well as substituting a trust company as lessee. The attorney for

Poston did draft a form of lease containing the agreements of parties as he understood them and submitted them to the defendant. Upon examination, the lease was found not to be in accord with the understanding of the parties in a great many particulars and the defendant refused to accept the same because thereof. Upon the aforesaid stated facts the defendant denies that there was any completed agreement between it and the said Poston and his associates covering the leasing of said 19,900 acres, but, on the contrary, it avers that there was always, in disagreement between the parties, vital provisions of the contract; that the lessee was never determined by the said Poston and that there was never a contract which could be enforced for the reason that there was only one party to it; that there was never any memorandum in writing of any such agreement as that set up by the plaintiff, in its bill signed by this defendant or its agent, such as would meet the requirements of the statute of frauds, which is here pleaded; and that it was always understood and agreed in all the negotiations for the lease of the 13,600 acres formerly leased to plaintiffs that no proposals should be binding upon the parties until the plaintiff had given its assent thereto by its duly authorized officers, and that such assent never was given nor obtained for the reason that the said Poston and this defendant had never agreed upon the essential elements of such lease.

The determinative issues raised by the bill and answer are as follows: *First,* Whether the lease of February 23, 1918, from the Rowland Land Company to the Virginian Export Coal Company for the 13,600 acres was entered into under a mistake of fact—namely, that the Virginian Railway Company would extend its line to the, leased premises, or permit a connection to be made, so as to afford an outlet for the shipment of coal from said premises to tidewater. *Second,* Was the Bellevue-Stratford agreement of January 27, 1921, supplementing Poston's letter of December 29, 1920, a valid and sufficient contract for the making of a new lease to another party for a tract of land of 6,300 acres including the 13,600 acres embraced in the former lease of February 23, 1918, to the plaintiff? If so, what was the effect of this

agreement upon the old lease of February 23, 1918, for the 13,600 acres under which the Rowland Land Company is now asserting claim for a minimum royalty against this plaintiff? *Third,* Was the understanding of the parties that they were to be mutually bound by any negotiations until the same had been reduced to a formal contract of lease and signed?

The old lease was taken at the peak of the war coal prices. Poston and Rowland were both men of affairs. There is no doubt that it was the belief of Poston that the connections with the Virginian Railway could be secured at the time he took the lease for the 13,600 acres. The unusual and persistent efforts of Poston afterwards to obtain the consent of the Government to the building of the branch railway showed that he considered it to be essential to the success of the mining project. While Rowland maintains that it was not recognized and understood by him at the time of the negotiations that this railway was necessary for the successful operation of the lease, the stipulation executed by his attorneys, and his subsequent actions, does show his knowledge and interest in the matter. The record shows that Poston wrote to Rowland April 16, 1918, only eight days after the delivery of the lease of February 23, 1918, telling Rowland of the obstacles he had met in endeavoring to secure railroad facilities and stating, "I fear the Chesapeake & Ohio are interfering," and asking his aid in securing the assent of the Government to the extension. To this Rowland replied on April 19: "I regret that you are having some trouble and delay in making your agreements for the extension of the Virginian Road into a portion of our lands which you have arranged to lease. The authorities at Washington seem to be more favorable to the opening of coal as they better understand the situation, particularly the time required after the railroad is built into the lands to begin the production of coal. I have no doubt that the Virginian Railway is in position with plenty of equipment to handle a large amount of coal tonnage." He assured Poston that he would aid him with the Government officials in Washington. Poston and Rowland met at the Peace Conference in Philadelphia on May 18, 1918, and talked

COAL CO. *v.* LAND CO. [Jan. 1926

the matter over. Rowland accompanied Poston to Washington on May 28, where they had a conference with C. R. Gray, one of the officials in the department of the Director of Railroads. Poston wrote Rowland the next day stating that as result of this conference that Mr. Garfield said that it "makes a new question of the whole matter." In response to another letter of Poston to Rowland, the latter on June 7, 1918, said: "If we could secure from Mr. Gray an indorsement of the plan as being a public necessity this would give you what is needed." On June 26, Poston wrote Rowland, inclosing a letter that he had written Senator James Hamilton Lewis soliciting his support with the Director of Railroads to secure permission for the proposed extension. Poston thus continued through the summer and fall of 1918, his efforts to secure the railroad connection. On December 18, 1918, the Virginian Export Coal Company, by its president, wrote J. Roman Way, president of Rowland Land Company, inclosing treasurer's check for $2,521.08 for taxes on the 13,600 acres, in which letter he made this statement: "First: It is understood, that this payment does not affect or destroy our right, at our election, to surrender and terminate the aforesaid lease, in the event we should be unable to get the leased coal to market via the Virginian Railway, as so understood between us at the time the said lease was executed." To this letter the attorneys for Rowland replied that they could not accept the check upon the conditions imposed, saying, "If any changes or modifications in the existing relation of the contracting parties is desired, or of provision of the contract, we feel sure, if presented in concrete form, they will have full consideration by the land company." About January 24, 1919, Poston and Slush met Rowland at Baltimore where the question of the payment of taxes on the land was discussed and some arrangement was made concerning the payment of same. On July 7, following, Poston wrote Rowland stating, among other things, "I want to make a trip to Colcord and look over the situation there in a general way, but more particularly with reference to the possibility of the Chesapeake & Ohio serving the extreme west portion of the lease." Poston testifies that this letter was written in re-

sponse to a letter from Rowland "about the C. & O. serving the west end of the lease." On July 25, Poston wrote Rowland: "I want to meet your ideas in so far as I possibly can, but there is little satisfaction in agreeing to something that cannot be carried out. * * * Railroad matters are in such chaotic state today it is practically impossible to get any understanding with the railways looking to the extension of lines and the expenditure of any considerable capital sum. All of this, of course, is known to you. * * * Therefore, I think that a definite conclusion upon this matter had better go over until your return from your vacation when we can get together and *draw the lease*. In the meantime I hope to arrive at some definite determination in at least our own minds as to just what we can accomplish and what lease terms will be absolutely necessary to enable us to meet the conditions with which railroad building is confronted." Rowland replied to this letter under date of September 17, 1919, saying: "I expect to be here now right along and will be pleased to hear from you if any suggested modification of the lease made with the Rowland Company by the Virginian Export Coal Company, in February, 1918." On October 8th, following, Rowland wrote Poston, in which he said: "We saw Mr. Siler at Charleston on Monday evening, and he told me that there was no doubt but that both the Virginian and the Chesapeake & Ohio would be extended promptly to take care of your business." Numerous letters passed between Rowland and Poston during the following winter, spring and summer. Then, followed the meeting at the Waldorf-Astoria in New York, on September 3, 1920, between Poston and Rowland and Way, at which the so-called "option agreement," heretofore set out, was prepared. The transactions between the parties in the time intervening between this event and the time of the execution of the memorandum at the Bellevue-Stratford, has likewise been detailed.

Is the plaintiff entitled to rescission on the first question raised? That deeds and instruments may be cancelled on the ground of mistake, when the mistake is clearly shown, is one of the familiar duties of a court of equity. *Wilson* v. *Mc-*

*Connell,* 72 W. Va. 81; *Isner* v. *Nydegger,* 63 W. Va. 677; *Taylor* v. *Godfrey,* 62 W. Va. 677. The same rule applies where the mistake is unilateral. In each of these cases, however, the contract was entered into under the assumption of the existence of a fact which in truth did not exist. Or, such a mistake for instance as where the purchaser thought he was negotiating for one tract of land, and the seller thought he was selling another. *Kyle* v. *Kavannah,* 103 Mass. 356. This is not the case here. The plaintiff here maintains that the contract was made in contemplation of the building of the railroad, essential to the object of the contract, which, in fact, failed to materialize. For this reason it asks rescission. The fortuitous presence in a transaction of some possibility of detriment is not enough. Courts are slow to say that promises, bearing upon their face the outward or formal tokens of a contract with mutual obligations, shall be set at naught on the assumption that the parties were oblivious of the advantages and burdens of their reciprocal engagements. *Walton Water Co.* v. *Walton,* 238 N. Y. 46; I Williston on Contracts, p. 233. It is a general rule of law that, where subsequent impossibility of performance might have been forseen by the promisor and he chooses to bind himself absolutely, he is not excused. 13 C. J. 639. In the instant case Poston knew this country was in war with a foreign power; that in furtherance of the interests of the country in such war the railroads had been taken over by the government; that no extension or building of railroads could be had unless the necessities of the country demanded it. He entered into the lease with full knowledge of these conditions. As we have shown he cannot be excused, for the prudent man might have forseen the situation with which he was later, in fact, confronted. Even had Poston had a definite arrangement with the Virginian Railway to build the extension, and upon the faith of this arrangement entered into the lease, still he would not be excused; for a promise may be conditional on the act or will of a third person. So that if a party undertakes to do a thing upon a condition that an act shall be performed by a third person and the latter fails or refuses, this is no excuse unless such refusal is procured by the other party. 13 C. J. 634.

"Though the obligation of the contract does not inhere or subsist in the agreement *proprio vigore,* the law so regards contracts and attaches to them such sanctity that, when fairly entered into by parties *sui juris* for purposes not immoral, unlawful or impossible of performance, it will not excuse non-compliance with the unconditional and unqualified terms of the undertaking. \* \* \* It requires both parties to be faithful to their covenants. \* \* \* If they have made no provision for a dispensation, the law gives none. 6 Rul. Case Law, 997. \* \* \* 'It is the duty of contracting parties to provide against contingencies,' as 'they are presumed to know whether the completion of the duty they undertake be within their power.' '' *Roberts* v. *Lumber Co.,* 76 W. Va. 290; *McCormick* v. *Jordan,* 65 W. Va. 86; *Carnegie Steel Co.* v. *U. S.,* 240 U. S. 156; *Bank* v. *Park,* 117 Iowa 552; *Nicol* v. *Fitch,* 115 Mich. 15; *Trenton Public Schools* v. *Bennett,* 27 N. J. L. 513; *Kendall Bank Note Co.* v. *Sinking Fund Comr.,* 79 Va. 563; *Jacksonville Navigation Co.* v. *Hooper,* 160 U. S. 514; *Mangnan Co.* v. *Fuller,* 222 Mass. 530; *Klauber* v. *San Diago Street Car Co.,* 95 Cal. 353; *Greil Bros. Co.* v. *Mabson,* 179 Ala. 444; *Cohen* v. *Morneault,* 120 Me. 358; *Prather* v. *Latshaw,* 188 Ind. 204; *Elmira Lumber Co.* v. *Owen,* 96 Ore. 127; *Virginia Iron Co.* v. *Graham,* 124 Va. 692; *Knitting Mills* v. *Fischer,* 132 Md. 1; *Winfrey* v. *Galena Auto Co.,* 113 Kan. 343.

But that the parties at the time of contracting realized that the expectations of obtaining adequate railway facilities might not come to fruition, is shown by the rider attached to the lease. To a proper understanding of this instrument we quote this stipulation of agreement executed by the attorneys of the lessor and lessee simultaneously with the execution of the lease: "It is understood and agreed that if by reason of the twenty-first clause in the contract of lease (here designating the lease) or by reason of any contract or relation between the Rowland Land Company and the Chesapeake & Ohio Railway Company the Virginian Export Coal Company is prevented from making proper arrangements with the Virginian Railway Company for construction, oper-

ation of or connection with a railroad to be constructed through the premises described in said lease for the development thereof the said Virginian Export Coal Company, lessee, may within ninety days from the date hereof surrender said lease without liability thereunder.'' The section of the lease referred to in the foregoing stipulation, is as follows: ''The lessee covenants and agrees that in its operation hereunder it will give all the traffic coming to or going from the demised premises to the Chesapeake & Ohio Railway Company, its successors or assigns and its connection line, whenever its rates and shipping facilities are as low and as favorable as those offered by any other railway which may carry such traffic from or to such premises. And the lessee shall have the benefits of any rights which the lessor has by or under contract with said railway company in respect to sidings upon the demised premises and rates on coal and coke from the same.'' It seems obvious that under a proper construction of these two provisions that the Virginian Export Coal Company was not given the power of rescission in the event of its failure of obtaining the railroad connection within ninety days, as a matter of right. The recital of the evidence we have made in this opinion as clearly establishes the fact that any failure to secure the railroad could not be properly laid at the door of Rowland. But giving it the broad construction claimed for it by the plaintiff—that it might rescind the contract as a matter of right within the ninety day period —what is the effect? The law is, that where the promisor has the right to do one of two things by a given day, his right of election is lost if that day passes without his election, and the right of election is thereafter in the party to whom the promise is to be performed. 13 C. J. 630; *Norris* v. *Harris,* 15 Cal. 226; *Phillips* v. *Cornelius,* 28 So. 871; *McNitt* v. *Clark,* 7 Johns (N. Y.) 465; *Kramer* v. *Ewing,* 10 Okla. 357; *Patchin* v. *Swift,* 21 Vt. 292. Applying this rule to the present case— the Virginian Export Coal Company, even if it had, by virtue of the terms of the rider, the controverted right to have rescission, not having made its election within the ninety days, the Rowland Land Company then had the right to stand on the terms of the contract as written.

The parties in interest, evidently taking the above view of the matter, thereupon, initiated another plan to obtain railroad facilities for the mining property, which culminated as we have shown in the Bellevue-Stratford memorandum. The additional 6,300 acres would give an outlet via the Chesapeake & Ohio Railway. This leads us to a consideration of the effect of this agreement. Whether the contract, consisting of Poston's letter of December 29, 1920, as modified by the Bellevue-Stratford memorandum of January 27, 1921, contains sufficiently definite terms of a contract for the making of a coal lease to a lessee, which, it was intended, should hold the 19,900 acres for the purpose of subdividing and sub-leasing the same to the operating companies? This contract, set out hereinbefore at length, was duly signed by recognized agents of the parties attempting to contract. The preparation of the papers carrying into effect the agreement was delayed by the absence of Mr. Rowland in Europe, and the business engagements of Mr. Poston covering several states.

Let us see whether or not there was a condition and agreement which the parties themselves considered material upon which their minds were not in concurrence at the time of the execution of the Bellevue-Stratford agreement. In order that a binding contract may result from an offer and acceptance, it is essential that the minds of the parties meet at every point, and that nothing be left open for future arrangement. *Krum* v. *Chamberlain*, 57 Nebr. 220. In *Ridgway* v. *Wharton*, 6 H. L. Cas. 268, Lord Wensleydale says: "An agreement to be finally settled must comprise *all* the terms which the parties intend to introduce into the agreement. An agreement to enter into an agreement upon terms to be afterwards settled between the parties is a contradiction in terms. It is absurd to say that a man enters into an agreement till the terms of that agreement are settled. Until those terms are settled, he is at liberty to retire from the bargain." These remarks are strikingly applicable to the present case. The parties in all their negotiations were discussing the terms of a paper or deed to be drawn up and signed by the parties themselves. Further, one of the essential requisites of every conveyance— a lessee—was lacking. True, by the terms of the memoran-

dum, the lessee was to be named by the Virginian Export Coal Company, but performance of the convenants of the new lease by such lessee was to be guaranteed by the New York Coal Company in form satisfactory to Rowland. Questions of grave legal import arose as to the terms of the guaranty, i. e., Whether in making it the guarantor would be acting within its corporate powers; and, further, what was the extent of the liability of such guarantor for the obligations of the lessee, under the unusual provisions of the lease? As to what terms should be embodied in this guaranty, to accomplish the purpose sought, counsel for the contracting parties held discordant views. They were never in harmony upon this vital matter. The lessee is dependent upon the guaranty. It does not require argument to prove that the right given to the Rowland Company to determine what the guaranty should be was an essential right and that so long as there was no agreement upon its terms there was—in legal effect—no lessee.

The fundamentals of a legal contract are competent parties, legal subject matter, valuable consideration and mutual assent. There can be no contract if any of these elements are lacking. *Adams* v. *Hazen,* 123 Va. 304. It is necessary to the validity of a written contract that the contracting parties be described, and the rules of certainty applicable to other essentials of the contract are applicable to the specification and determinability of the parties thereto. 13 C. J. 262; *North Packing Company* v. *Lynch,* 196 Mass. 204; 81 N. E. 891; *Clark* v. *Great Northern,* 81 Fed. 282; *Webster* v. *Ela,* 4 N. H. 540; *Marshall* v. *White Creek Tp. Co.,* 7 Cold. (Tenn.) 252. The situation must be such that either party could sue for specific execution of it. There must be mutuality of remedy. *Moore* v. *Fitz Randolph,* 6 Leigh, 175; *Bumgardner* v. *Leavitt,* 35 W. Va. 194; *Hissam* v. *Parish,* 41 W. Va. 686; *Boyd* v. *Brown,* 47 W. Va. 238; Fry, Spec. Perf. p. 198; *Pac. Ry. Co.* v. *Campbell-Johnston,* 153 Cal. 106; 36 Cyc. 622. Suppose the Rowland Land Company wanted to require specific execution of the contract under consideration, who would it sue as the contracting party on the other side? To whom would it make the lease that it would have to tender in performance of its part of the contract? In *Lovesay* v. *Palmer,* 2 L. R. (Ch.

Div.) 233, a lease was to be made to a corporation thereafter to be formed. No other lessee was mentioned in the contract. Specific performance was refused because no lessee was provided for in the contract sought to be enforced. To same effect. *Jarrett* v. *Hunter,* 34 L. R. (Ch. Div.) 182. Upon this essential element of the contract the minds of the parties here were never in agreement. Again, here was a paper dependent upon the proper execution of another paper 'of release that had never been agreed to by the parties to be bound. Can we say by the broadest rule of construction that each of the parties to the $500,000.00 subscription ever placed themselves in a situation to be compellable to sign such an agreement of release as Rowland desired them to sign? The best that can be said of the correspondence and memorandums in the record is they created no agreement. It is purported to arrange only certain portions of a contemplated agreement to be reduced to writing and signed by the parties, and conceded that there were other material portions to be arranged thereafter. Neither party could have maintained an action for specific performance, or for damages for non-performance, on the agreement evidenced by the letters and memorandums, for the reason above stated. The agreement was inchoate, not capable of enforcement. There was a difference among the solicitors for each party attempting to draw the lease. Neither solicitor acting for the parties at any time yielded to the claim and construction contended for by the other. This difference was never reconciled. The case presented is therefore one of imperfect negotiation, and not a completed contract. *Hermann* v. *Goddard,* 82 W. Va. 520; *Hinchman* v. *Ballard,* 7 W. Va. 152; Pom. Spec. Perf. pp. 81-89; Tyson Spec. Perf. of Cont. (New Am. Ed.) 230-342; *Berry* v. *Wortham,* 96 Va. 87; *Creecy* v. *Grief,* 108 Va. 320; Fry on Specific Per. Cont. (New Am. Ed.) 230 and 242; *Graham* v. *Call, Ex'r.,* 5 Munf. 396; *Baker* v. *Glass,* 6 Munf. 212; *Milnes* v. *Gery,* 14 Ves. Ch. (Jr.) 400.

This leads us to consider the remaining question, Was the understanding of the parties that they were not to be mutually bound by any negotiations until the same had been reduced to a formal contract of lease and signed? The circuit court

answered this question in the affirmative. As contended by counsel for the plaintiff, it is an undoubted principal of law, that a valid contract may be made by memorandum, telegrams and correspondence, but the authorities as expressly hold that care should always be taken not to construe as an agreement that which the parties only intended to be a preliminary negotiation. The question in such cases always is, say all the books, did they mean to contract by the memorandum of agreement, or were they only settling the terms of an agreement into which they proposed to enter after all its particulars were adjusted, which was then to be formally drawn up and by which alone they designed to be bound? No positive rule can be laid down to guide the court in arriving at the intention in all cases. Such intention must necessarily depend upon the nature of the transaction, the circumstances and surroundings appearing in each particular case. *Oil & Oil Land Co.* v. *Vinal,* 14 W. Va. 637. The nature of the transaction here was such as is ordinarily not concluded until a deed is executed and delivered. The subject matter is one which required not only the execution of a deed but the execution of a deed of release as well. There were a great many details to be included in the contract. The amount involved was large. It was an unusual contract, not only from the standpoint of general business contracts, but it was an unusual contract from the standpoint of a lease for coal mining purposes. The correspondence between the parties is likewise illuminating on this question. On the one hand, Poston, in a letter to Rowland, on July 25, 1919, used these significant words: "This matter had better go over until your return from your vacation when *we can get together and draw the lease.*" Up as late as January 8, 1921, Poston referred to the matters in his letter of December 29, 1920, as having been only "tentatively agreed upon." On the other hand, Rowland, wrote Poston under date of April 16, 1921, in part: "Before executing the formal lease or at the time the lease is signed or delivered it will be necessary to have in hand a release to us from the Virginian Export Coal Company of the agreement made in February, 1918. This should also be entered into by the various parties who signed the agreement to subscribe certain stock,

namely $500,000 of the Virginian Export Coal Company. Of course, this you thoroughly understand as do Judge Pendleton and Mr. ·Brown. It seems bad business for all parties concerned to allow this matter to remain in its present somewhat unfinished condition.'' The foregoing excerpt, as well as the tenor of the entire letter, together with the quoted extracts from the Poston letters, supports most strongly the contention of the defendant that the parties did not intend that the negotiations should be binding upon them until they had actually entered into a written lease. *Ely* v. *Phillips*, 89 W. Va. 580; *Hoon* v. *Hyman*, 87 W. Va. 659; *Herndon* v. *Meadows*, 86 W. Va. 499; *Ambler* v. *Whipple*, 20 Wall. 546; *Lyman* v. *Robinson*, 14 Allen, 242; *Mississippi, etc. Co.* v. *Swift*, 86 Me. 248; *Brown* v. *Railway Co.*, 44 N. Y. 79. For it has been held that, "If, though fully agreed on the terms of their contract, they do not intend to be bound until a formal contract is prepared, there is no contract, and the circumstances that the parties do intend a formal contract to be drawn up is strong evidence to show that they did not intend the previous negotiations to amount to an agreement." *Adams* v. *Hazen*, 123 Va. 304. To same effect. *Boisseau* v. *Fuller*, 96 Va. 45; Clark on Contracts, page 38. As the court said in *Winn* v. *Bull*, 7 L. R. (Ch. Div.) 29, "When the bargain is for a lease which is to be formally prepared, in general no solicitor would, unless actually bound by the contract, prepare a lease not containing other · covenants besides, that is, covenants which are not comprised in or understood by the terms 'usual covenants'.'' In that case it was held that the agreement was uncertain in its terms. In the instant case according to the last mentioned Rowland letter, each of the parties to the $500,000 subscription should execute a release. There was no provision in the contract for such action. If, however, such action was required, how were they bound so to do? The final outcome of the deal will be seen to hinge upon whether not only was a lease prepared and executed upon which all interested could agree and execute, but whether such a release might be agreed upon and executed by the parties interested in the Virginian Export lease, as would meet the views of the Rowland Land Company. On the whole case it seems plain that the nego-

CoaL Co. *v.* LAND Co. [Jan. 1926

tiations and dealings of Poston and Rowland, concerning which the Bellevue-Stratford memorandum dealt, were based on the consummation of a lease to be subsequently executed and signed by the parties, and the failure to bring about such enforceable agreement embodying the whole object of such negotiations nullified the preliminary promises, which were interdependent.

Equity does not lag. The whole record cannot be read in any other light than that Poston was remiss in his efforts to bring the negotiations to a conclusion. They covered not only months but years. Poston absented himself from the New York conference, although warned by Rowland, who was chafing at the delay, that unless he were present, or have someone represent him there, all negotiations would be at an end. Thus concededly responsible for the failure of the object of the conference, Poston admitted on the witness stand that he "did not attempt further negotiations." This attitude is taken in face of the fact that Knight, attorney for Rowland, stated to Pendleton, attorney for Poston, at the breaking up of the conference, that he would be very glad if negotiations were reopened but that Rowland "would hunt them no longer"; whereupon, Judge Pendleton expressed the hope and expectation that the parties would "get together and conclude an agreement and lease very soon." The law imposes upon him who seeks specific performance of a contract the duty of being at all times ready, desirous, prompt and eager to perform his part of the agreement. Poston here occupied a dual position. Claiming to be the guiding hand of each the Virginian Export Coal Company and the New York Coal Company, in effect, he seeks in this suit, to be relieved of the responsibilities of the old lease, without assuming the burden of the new. This course makes a dull appeal to a court of equity.

As we view it there is no merit in the plaintiff's point that the payment of the option money to the defendant amounted to an acceptance of rent by the defendant under the negotiated lease. At the time this money was paid according to the plaintiff's own theory of the case there was no contract in existence under which royalty or rent could issue. It was paid prior to the execution of the Bellevue-Stratford memorandum upon

which the plaintiff bases its cause. Whether or not this option money may be recovered from the defendant by Poston and his associates, or either of the corporations he represented, the court is not here called upon to determine.

The result of these views of the Court is that the decree of the circuit court must be affirmed.

*Affirmed.*