**WAUGH et al. v. Q. & C. CO. et al. ***

(Circuit Court of Appeals, Seventh Circuit. October 4, 1926.)

No. 3667.

**I. Attorney and client ⬥144.**

It is attorney's duty to deal fairly with client in matter of fees, and doubtful or ambiguous language in agreement for fees must be construed most favorably to client.

**2. Attorney and client ⬥166(1).**

Evidence *held* to show that client was not overreached in making contract with attorney on contingent fee basis.

**3. Attorney and client ⬥148(3).**

Whether contingent fee is excessive cannot be determined by sum ultimately due thereunder.

*Rehearing denied January 20, 1927.

**4. Attorney and client ⬥148(3)—Clause of contingent fee contract, in which client agreed to pay 25 per cent. of amount received in any settlement, relieving client as selling agent, if such contingency occurred, held to supersede clause limiting fee to $10,000 in another contingency.**

Clause of contingent fee contract in which client agreed to pay attorney 25 per cent. of amount received in any settlement, relieving client as selling agent if such contingency occurred, *held* to supersede preceding clause, agreeing to pay 10 per cent. of gross profits, but not to exceed fee of $10,000, if preliminary injunction, resulting in reinstating client as selling agent, was obtained, and $10,000 maximum limit did not apply thereto.

**5. Attorney and client ⬥149—Settlement contract, wherein exclusive selling agent transferred all its right and license, held to release agent as selling agent, within contract employing attorney on contingent fee basis.**

Settlement contract, wherein exclusive selling agent transferred all its right and license to sell certain device, *held* to relieve agent as selling agent, within agreement between agent and its attorney providing for certain contingent fee in event of such a settlement.

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Illinois.

Suit by S. J. L. Waugh, administratrix of the estate of Walter Chamberlin, deceased, and another, against the Q. & C. Company and another. From a decree for plaintiffs granting insufficient relief, plaintiffs appeal. Reversed, with directions.

Sidney W. Worthy, of Chicago, Ill., for appellants.

Addison S. Pratt, of New York City, for appellees.

Before ALSCHULER, EVANS, and ANDERSON, Circuit Judges.

EVAN A. EVANS, Circuit Judge. Plaintiffs (appellants herein) brought this suit for an accounting to recover the amount due them for legal services. A brief statement of the facts which led up to this litigation is necessary to understand the contract, which established plaintiffs' right to compensation and fixed and determined the amount thereof.

About 1902, the railroads of the country began to use antirail creeping devices in ever-increasing numbers. The growth of the industry was accompanied by the appearance of numerous novel types for which patents were obtained from the government. Respecting the validity and scope of these patents there was much conflict and much uncertainty. The various patentees, or most of

them, finally assigned their patents to one Barnett as trustee, and an arrangement was made to increase sales to the mutual advantage of all. Barnett gave to one company the exclusive right to manufacture the devices, and to another company the exclusive right to sell them. A new patent (known as the Vaughan device) then appeared. Litigation was threatened, and the intruder accepted the proffered shelter, but on somewhat different terms.

The defendant (Q. & C. Company) became the exclusive selling agent under the aforesaid agreement, and it agreed to pay Barnett, for distribution among the patentees, a certain sum or royalty (not less than $30,000 per year). Quincy was the president of the Q. & C. Company. We shall speak of the Q. & C. Company as the defendant. For the year 1912 defendant's sales were insufficient to equal the minimum royalties, and Barnett elected to terminate its contract. A new agreement or a modification of the prior one was thereafter negotiated, which was called a "promotion contract" in this litigation. Generally speaking, in addition to the old terms, it was provided that defendant should advance moneys ($25,000 the first year) to increase sales, and be reimbursed later out of these increased sales.

During this period, however, a formidable competitor had entered the field, whose business exceeded defendant's. Barnett viewed this competitor as a far more effective selling agency than defendant, and he again notified defendant that he terminated its sales agreement because of its inability to sell the minimum number of anchors. He then entered into a similar agreement with defendant's competitor. It was at this stage of the struggle that defendant engaged one Chamberlin, a Chicago patent lawyer of good standing at the bar, and authorized him to employ additional counsel. The agreement for compensation was reduced to writing, a copy of which is herewith set forth:

"Pursuant to the several conversations we have had on the subject, I am setting forth in writing our agreement as to payment for the services of counsel (meaning thereby not only my own services, but also any counsel that I may have associated with me) in the P. & M. litigation.

"(a) In case we fail to secure from Judge Sanborn a preliminary injunction, as asked in the bill of complaint, you to pay us five hundred dollars ($500.00) for services to date in the matter.

"(b) In case we secure from Judge Sanborn a preliminary injunction, then the services up to date are to be included in the contingent arrangement hereinafter specified.

"(c) In case we secure a preliminary injunction from Judge Sanborn the result of which is reinstating you as selling agent for the Vaughan devices, you to pay us ten per cent. (10%) of all gross profits as shown on your books, but only until ten thousand dollars ($10,000.00) has been paid to us.

"(d) In case a settlement is made which relieves you as selling agent of the Vaughan devices, either in the shape of a royalty or a fixed lump sum or a fixed annual sum, you to pay us twenty-five per cent. (25%) of the amount received by you on such settlement, and this excludes any sum paid you by reason of overpayments by you to Barnett in the past.

"(e) In case any settlement is made which involves a payment to you for overpayments by you to Barnett in the past, or in case the court orders the accounts surcharged and orders a payment to you as a result thereof, you to pay us fifty per cent. (50%) thereof as paid to you.

"(f) You to pay all actual expenses involved.

"(g) It is understood between us that you shall have full and absolute power to decide on all questions of policy, such as continuing or dropping the suit, and as to any moves to be made and the basis of any settlement that may be made as between you and the other parties in litigation.

"(h) No matter whether Judge Sanborn refuses the preliminary injunction or not, if the suit goes to final hearing the actual expenses involved in the trial of the case are to be deducted before any settlement is made between us.

"(i) It may be that the court will refuse to order any return to you for past overpayments under clause (e) hereof, but will order that future accountings be made on the basis we are urging in the bill of complaint. It is therefore understood between us that we are to have 50% of any saving to you arising out of the new basis of keeping the accounts as compared with the amount you would have had to pay under the old basis of keeping the accounts."

Chamberlin employed Wegg, a lawyer in good standing at the bar, to assist him. Both died before the instant suit was tried. Defendant, prior to employing Chamberlin, had sought the advice of other counsel of excellent standing, and had received a somewhat discouraging opinion respecting its chance of avoiding a cancellation of the exclusive selling agency.

Plaintiffs were most successful in their efforts. They sued to enjoin the cancellation of the exclusive agreement, demanding an accounting, etc. They promptly obtained a temporary injunction in the United States District Court, from which an appeal was taken. On appeal they were also successful. 226 F. 935. Both Barnett and the defendant's competitor became anxious to compromise, and as a result a most satisfactory settlement was made whereby defendant was relieved of its obligations to pay the minimum royalty. As a selling agency it ceased to exist, but in lieu thereof a royalty or percentage of profits was paid it, and the competitor secured a monopoly of the entire anchor business. The anchor business flourished and defendant's royalties under the terms of the settlement grew increasingly.

Defendant made certain monthly payments to plaintiffs, but disagreements arose and payments stopped. The total amount thus paid was $2,971.98. The decree in the court below was for the plaintiffs, but the court held that plaintiffs were limited to a recovery of $10,000 under this aforementioned contract. Plaintiffs thereupon appealed.

[1, 2] In construing the contract, we have applied the rule which imposes upon counsel the duty of dealing fairly with his client in matters of fees (Cooper v. Bell, 127 Tenn. 150, 153 S. W. 844, Ann. Cas. 1914B, 980), and which rule also requires us to construe doubtful or ambiguous clauses or phrases appearing in such a contract most favorably to the client (Brackett v. Ostrander, 126 App. Div. 529, 110 N. Y. S. 779). We find nothing in the evidence, however, that suggests, much less tends to establish, any overreaching or other improper conduct on the part of the attorneys. Mr. Q., representing defendant, was an experienced business man, and was able financially, as was his company, to employ counsel on the basis of a per diem, as well as on a contingent basis. He was advised as to his legal rights by other reputable counsel, and both he and his company had much experience in contracts of this character, and were familiar with patent litigation, etc., in the federal courts.

Q. chose to employ counsel on the contingent fee basis advisedly and out of an abundance of caution. The same caution, no doubt, led to the insertion of clause (g) in the agreement, which read:

"(g) It is understood between us that you (Q. & C. Company) shall have full and absolute power to decide on all questions of policy such as continuing or dropping the suit and as to any moves to be made and the basis of any settlement that may be made as between you and the other parties in litigation."

Certainly upon this showing there can be no serious urge that defendant was overreached, or that the parties did not meet on an equal footing, or that the attorney obtained a one-sided contract. It is inferable that defendant was more successful in the litigation than it expected, and that it now finds its fee contract burdensome. Doubtless it did not fully appreciate how great a nuisance value it had, once the contract was reinstated. Its present contention that plaintiffs' charges are excessive, is necessarily predicated upon the assumption that its royalties resulting *solely* from this successful litigation have reached, or will reach, approximately half a million dollars.

[3] Whether a contingent fee is excessive can hardly be determined by the sum ultimately due thereunder. For such sum depends upon the amount the client receives. In the present case, the evidence is undisputed that the percentage allowed in case of a recovery was not only reasonable, but was the usual and customary charge in Chicago for legal services of like character rendered on a contingent fee basis.

[4] Nor is there anything in the language of the contract that is uncertain or ambiguous. Respecting clause (a) there can be, and is, no controversy. Its only significance arises out of its possible aid in construing other provisions of the agreement. It provided for a contingency that never came into existence. Clause (b) is likewise unimportant, save as it indicates that the defendant desired the litigation to be conducted on a contingent fee basis. Clause (c) provided a basis for compensation and fixed a maximum sum of $10,000 as a limitation. Clause (d) contained a provision for compensation in case of a certain contingency not covered by clause (c), and we think superseded clause (c) in case that contingency arose.

The contract must be read as a single agreement covering numerous contingencies. Just as clause (a) covered the contingency of defeat in the contemplated litigation, so did clause (c) cover the contingency of success in this litigation. But clause (d) obviously covered another contingency, operative, too, only in case of success in the litigation. In other words, the immediate purpose of the litigation was to sustain defendant's exclusive selling agency contract which Barnett had canceled, or attempted to cancel, because of the alleged failure of defendant to sell the minimum number of patented anchors. The parties, however, evidently contemplated that as a result

of success in this litigation, a settlement more advantageous than mere reinstatement of the contract, would follow; that is to say, if the sales agency contract was sustained, the parties might and probably would, negotiate a new agreement whereby the defendant would be relieved of its obligation to sell these anti-rail creeping devices or anchors, and in lieu thereof would be paid a sum in cash or a royalty based upon the number of anchors sold in the future.

It is not possible to read the contract or the correspondence and reach any other conclusion. As a selling agency of railroad anchors, defendant would not have profited greatly, if it had merely been reinstated as selling agent. But if the exclusive selling agency contract was sustained, its position became an advantageous one. It could force Barnett to purchase a release. That Barnett may have paid more than either plaintiffs or the defendant expected when the litigation was commenced cannot in any way affect the rights of either party. Nor can the increase in the rail anchor business, which resulted in increased royalties to defendant under the settlement referred to in clause (d), affect the ultimate determination of the case.

Once clause (d) became operative, it determined the amount of the compensation which plaintiffs were to receive, or at least it prescribed the percentage which was to be used in the computations. The exact amount, of course, depended on the volume of business, which the future alone could determine. In other words, clause (c) was fully superseded by clause (d), and we are confronted with defendant's urge that the $10,000 maximum limit was applicable to this clause (d). The contract, however, does not so provide. Likewise the differences appearing in the terms of compensation (25 per cent., instead of 10 per cent.) negative any such construction.

The contingency whereupon clause (d) became operative was one which defendant most devoutly wished to occur. It could and no doubt was willing to pay more, in the event of a settlement such as was provided for by this clause, than under clause (c). Moreover, why should there be the difference in percentage, if there existed in both cases a limitation of $10,000, which maximum amount was almost certain to be effective. Nor can we find evidence to sustain the defendant's urge that the settlement was made some time after the courts had upheld defendant's contract, and resulted largely from defendant's effort to make such a settlement rather than from the court's decree. From the very nature of the case, such a settlement as was contemplated by clause (d) could not be satisfactorily ne-

gotiated until plaintiffs had vindicated defendant's right to be reinstated as the exclusive selling agents of the Vaughan device.

Clause (e), while covering a part of the same litigation, had reference, nevertheless, to a distinct and separate item. Judging from the fact that the attorneys were to receive a much larger percentage of the amount recoverable, it was evidently viewed by both client and attorney as a more uncertain item. The 50 per cent., however, confirms our conclusion that no $10,000 limitation applied in case plaintiffs were entitled to recover under clause (d) or clause (e) of the contract; for it follows, it seems to us, that the argument in favor of a maximum limitation of $10,000 applies as well to clause (e) as to clause (d). As this clause (e) related to past transactions, and therefore was freed from the uncertainties of future profits or the volume of future business, and inasmuch as 50 per cent. of the amount claimed by the defendant *exceeded* $10,000, it is inconceivable that such a maximum limitation as was inserted in clause (c) applied to clause (e).

[5] It is finally contended that defendant's new contract with Barnett did not bring the "settlement" within the language of clause (d). This urge is predicated upon the assertion that defendant was not relieved as a selling agent of these rail anchors. A few quotations from the settlement contract will suffice to disprove the premise upon which this argument is predicated.

"The said Quincy interests do hereby jointly and severally assign to the company each and every of their joint and several rights under and by virtue of any or all of the aforesaid agreements and licenses, or of any agreement, understanding and license relating in any manner to United States letters patent or patent rights owned in whole or in part by said trustee or by said M. W. Supply Company, David F. Vaughan, David L. Vaughan, or Charles Z. Vaughan, or which said Quincy interests, or either of them, may at any time own, in whole or in part, legally or equitably, or under which they have or may have, any right, title, or interest, during the life of this agreement relating to anti-creeping devices, to the end that said company may be vested with all right and license to sell anti-creeping devices within the United States of America, which might otherwise be enjoyed by said Quincy interests, and that all rights of said the Q. & C. Company and of said Quincy to receive royalties, profits, surplus, or other moneys, from the manufacture or sale of anti-creeping devices in the United States of America may be superseded by the provisions hereof during the life hereof."

"Twentieth. Said Otto R. Barnett, the Q. & C. Company, and Charles F. Quincy, Laas & Sponenburg Company, Scott Manufacturing Company, and Belle City Malleable Iron Company do hereby, jointly and severally, ratify and confirm each and every account heretofore made by and between said the Q. & C. Company and the said trustee under and by virtue of any and all existing contracts by and between the Q. & C. Company and the said Quincy, or either of them, and any or all of the other parties hereto, and do hereby admit and agree that each and every accounting heretofore had by and between said the Q. & C. Company and the said trustee has been in accordance with the true intent, purport, and effect of each and every contract to which such accountings or any of them, have related, and they do hereby jointly and severally agree to hereafter account in the same manner and on the same basis for all sales of Vaughan devices made prior to June 1, 1916, which shall not have been heretofore accounted for, and except as to such sales they do further jointly and severally release, each of the other respectively any and all claims of every nature arising from or on account of any things done at any time heretofore by said parties, or any of them.

"And all the parties hereto do hereby further agree that the suit filed by said the Q. & C. Company now pending in the United States District Court for the Eastern Division of the Northern District of Illinois, No. 461 on the chancery side thereof, together with the counterclaim therein, shall upon the execution thereof be dismissed, without costs as between the parties, and the parties hereto do further jointly and severally release, each to the other, all claims and demands in any manner set forth in the pleadings in said suit."

The decree is reversed, with costs, with directions to enter one consistent with the views herein expressed.