648 S.E.2d 8

**SCHRADER BYRD & COMPANION, P.L.L.C., Plaintiff Below, Appellee,**

v.

**Francis G. MARKS, et al., Defendants Below, Appellants.**

**No. 33184.**

Supreme Court of Appeals of West Virginia.

Submitted: Feb. 13, 2007.

Decided: April 5, 2007.

Dissenting Opinion of Justice Maynard May 1, 2007.

Concurring Opinion of Justice Albright July 30, 2007.

Dissenting Opinion of Justice Benjamin July 27, 2007.

---

Ray A. Byrd, Esq., John Porco, Esq., Schrader, Byrd & Companion, Wheeling, for Appellee.

John Preston Bailey, Esq., Bailey, Riley, Buch & Harman, Wheeling, for Appellants.

STARCHER, J.

In this case from the Circuit Court of Ohio County, we uphold the circuit court's conclusion that a law firm's fee payment arrangement with its clients is fair, reasonable, and consistent with the original retainer agreement.

## I.

### Facts & Background

#### A.

##### Introduction

The instant case involves a declaratory judgment action filed in 2004 by the law firm of Schrader, Byrd and Companion, PLLC ("SBC"), the plaintiff below and the appellee before this Court. SBC asked the Circuit Court of Ohio County to determine the legal propriety of an attorney fee payment agreement that SBC made in 1998 with two of SBC's clients, Josephine Luther and Mary Catherine Marks (Ms. Marks is now deceased).

The declaratory judgment action filed by SBC named Ms. Luther and the heirs of Ms. Marks as defendants. The defendants, who are the appellants before this Court, filed a response asserting that the fee payment agreement was improper and should not be enforced. On December 13, 2005, the circuit court granted SBC's motion for summary judgment, ruling that the fee payment agreement was not improper.

The fee payments in question arose from litigation in which SBC, on behalf of Ms. Luther and Ms. Marks, filed a lawsuit in 1988, challenging the validity of a coal mining

lease on mineral property in Boone County, West Virginia. Ms. Luther and Ms. Marks each held a one-quarter interest in the property; their two brothers also each held a one-quarter interest. Ms. Luther and Ms. Marks and their brothers apparently acquired their interests from their father, Garner Williams. We will refer to the legal challenge to the coal mining lease that was brought by SBC on behalf of Ms. Luther and the late Ms. Marks as the "Garner Williams litigation." [1]

The fee payment agreement in part called for SBC to receive, on an ongoing basis, thirty percent of an increase in coal royalties from mining on the Boone County property, as mining was conducted and the increased royalties were paid to the appellants. SBC negotiated the increased royalties as part of the settlement of the Garner Williams litigation. After paying the percentage-of-increased-royalties fees to SBC for several years, the appellants questioned the propriety of continuing to make payments to SBC. SBC then filed the 2004 lawsuit that underlies the instant appeal to this Court.

### B.

### *The Garner Williams Litigation*

As previously noted, SBC's clients and their two brothers each owned an undivided one-fourth interest in Boone County mineral property. Laxare Coal Company ("Laxare") first leased the property in 1966; this lease was replaced by a lease dated July 1, 1968. The details of the 1968 lease, and specifically the reasons why it was later claimed to be invalid as to the two sisters, are not clear from the briefs—but it appears that the two brothers may have "signed for" their sisters in some fashion.

In 1974, Laxare subleased the property to Cannelton Coal Company ("Cannelton"), and Laxare and/or Cannelton mined the Boone County mineral property beginning as early as 1974. Cannelton constructed a multi-million dollar preparation plant on the property. Beginning in 1968, Laxare paid Ms. Marks and Ms. Luther (apparently through their brothers) a portion of the royalty and other fees due under the 1968 lease.

In 1988, SBC filed suit for Ms. Luther and Ms. Marks in the Circuit Court of Kanawha County against Laxare and Cannelton, claiming that the 1968 lease was invalid as to Ms. Luther and Ms. Marks. Laxare and Cannelton resisted Ms. Marks' and Ms. Luther's claims against them, primarily on the basis of laches and/or estoppel.

Laxare and Cannelton argued that Ms. Marks and Ms. Luther should pursue claims against their brothers, because the brothers allegedly failed to pay them their proportionate share of the royalties and fees under the 1968 lease. Laxare and Cannelton also argued that the brothers gave written assurances that Ms. Marks and Ms. Luther consented to the 1968 lease.

In 1995, Laxare filed for bankruptcy. In 1996, the bankruptcy court entered an order permitting Laxare to continue mining under the 1968 lease, on the condition that Laxare provided adequate financial protection to Ms. Marks and Ms. Luther (if it was later determined that Ms. Marks and Ms. Luther were not bound by the lease). Laxare agreed to deposit amounts over and above the royalties and fees set forth in the 1968 lease into an escrow account, pending a final determination as to whether Ms. Marks and Ms. Luther were bound by the lease.

---

1. The record before this Court is sketchy regarding many aspects of the Garner Williams litigation. The record contains SBC's billing records and a few documents relating to the settlement of that litigation that SBC attached to its motion for summary judgment, and a brief affidavit from Ms. Luther. The appellees did not file an affidavit pursuant to *West Virginia Rules of Civil Procedure*, Rule 56(f), arguing that further discovery was needed before taking up SBC's motion. Some of the factual details about the conduct and settlement of the Garner Williams litigation that are set forth in Part II.B. of this opinion are taken from the assertions of SBC in its appellate brief and cannot be verified from the record on appeal. These factual assertions are consistent with the limited record on appeal and have not been challenged by the appellants in their appellate briefs; nor did the appellants assert contrary facts before the circuit court; hence we treat them as accurate for purposes of our discussion. However, we note that the Court's decision in the instant case does not turn on any particular detail of how the litigation went forward, or how the settlement came to occur.

At this stage in the litigation, it became clear that Ms. Marks and Ms. Luther would be bound either under the 1968 lease or under a new lease approved by the bankruptcy court. Even though the bankruptcy court had remanded Ms. Marks' and Ms. Luther's claims against Laxare back to the Circuit Court of Kanawha County, it also became clear that any damages assessed against Laxare might be discharged in bankruptcy, and in any event would be subject to the jurisdiction of the bankruptcy court. The bankruptcy court strongly urged the parties to settle their differences, because the significant possibility existed that Ms. Marks and Ms. Luther would recover nothing from Laxare.

The case was further complicated by the fact that in 1994 Cannelton had abandoned its 1974 sublease with Laxare, and terminated all mining at the Boone County mineral property. As a result, Laxare asserted a damages claim against Cannelton in the Garner Williams litigation, alleging premature termination of the 1974 sublease.

The confluence of these complex facts and claims, plus the bankruptcy court's strong urging that the parties settle their differences, caused the parties in the Garner Williams litigation to begin discussing settlement in earnest. SBC, Ms. Marks, and Ms. Luther recognized that if Laxare and Cannelton prevailed on their laches and/or estoppel defenses, the possibility existed that Ms. Marks and Ms. Luther would recover nothing from Laxare, and Cannelton and could only recover from their brothers, who had no meaningful assets.

In 1998, after nearly ten years of litigation, the parties reached a final settlement agreement in which Ms. Marks and Ms. Luther

agreed to compromise their original claims against Laxare and Cannelton. These claims amounted to $15–50 million dollars in actual damages, and possibly $59 million to in excess of $200 million in damages—if there were a finding of intentional trespass.

In exchange for Laxare and Cannelton abandoning their defenses of laches and/or estoppel and agreeing that the 1968 lease did not bind Ms. Marks and Ms. Luther, Ms. Marks and Ms. Luther agreed to accept a lump sum payment of $3.5 million, plus the execution of a new lease and side letter agreement beneficial to Ms. Marks and Ms. Luther. The new lease and side letter agreement gave Ms. Marks and Ms. Luther substantially increased royalty amounts over and above those set forth in the 1968 lease. Their two brothers and their families, however, are still bound by the 1968 lease. The new lease increased the sisters' guaranteed minimum royalty from $6,000.00 per year to $30,000.00 per year, and increased the production royalty from a flat 12.5¢ per ton to a minimum of $1.50 per ton, or a percentage of the gross sale price, whichever is higher. A side agreement provided for certain additional per-ton wheelage and preparation plant payments to the sisters.[2]

## C.

### Attorney Fees

SBC's 1988 written retainer agreement with its clients provides that Ms. Marks and Ms. Luther retained SBC "to prosecute a claim against … Laxare, Inc. and Cannelton Industries, Inc. and any other person … that may be liable for, or on account of, loss of income and other damages sustained by [Ms. Marks and Ms. Luther] as a result of the wrongful and improper mining of mineral

---

**2.** In addition, Laxare entered into new leasing arrangements with Boone East Development for all of Laxare's mineral properties. The bankruptcy court approved and authorized these leasing arrangements with Boone East Development. Boone East Development's assumption of the 1968 lease was contingent upon a court finding that the lease was valid as to all ownership interests in the property and/or Laxare providing adequate protection for Ms. Marks and Ms. Luther if the court later determined that the lease was invalid as to them. Simply put, Boone East Development was prepared to proceed with or

without a new lease, with Ms. Marks and Ms. Luther and was authorized to do so by the bankruptcy court. The negotiation of the new lease as part of the settlement gave Ms. Marks and Ms. Luther an opportunity to negotiate its terms, as opposed to having the bankruptcy court set the terms. However, before being able to negotiate those terms themselves, Ms. Marks and Ms. Luther had to first prevail on the issue of the validity of the 1968 lease. As part of the settlement, Laxare, Cannelton and Boone East Development agreed that Ms. Marks and Ms. Luther were not bound by the lease dated July 1, 1968.

property situate in Boone County.... [and that Ms. Marks and Ms. Luther] agree to pay [SBC] 30% of the amount collected by any such settlement in each such action."

In 2004, at the time of settlement, SBC received one-third of the $3.5 million dollars that Ms. Marks and Ms. Luther received, or $1,050,000.00. SBC had spent approximately 4,062.45 lawyer hours and 920.35 paralegal hours on the Garner Williams litigation. SBC's work included litigation in the Circuit Courts of Boone and Kanawha Counties, the United States Bankruptcy Court for the Southern District of West Virginia, and two appeals to this Court. Pro-rated over the life of the litigation, SBC received roughly $250.00 per hour for its attorney time and $100.00 per hour for its paralegal time. These figures are well within the standard hourly non-contingent rates for firms of SBC's caliber, even without consideration of the contingent nature of the fee in question.

At the time of the final settlement discussions and shortly before the execution of the final settlement papers, SBC discussed in detail with its clients (or their representatives) how SBC proposed to calculate and collect its fee. These discussions were memorialized in two documents that are part of the record: a letter sent to the clients outlining the settlement in detail; and a contemporaneous time record entry by an SBC attorney.

First, a letter from SBC attorney Ray Byrd to Ms. Marks and Ms. Luther, dated March 31, 1998 states in part:

This is to confirm and follow-up on our telephone conversation of March 30 in regard to the computation of our fee due under the December 20, 1988 contingent fee contract as a result of the global settlement with all parties involved in the Garner Williams litigation.

If you will recall, under the December 20, 1988 contingent fee contract, we are entitled to a contingent fee of thirty percent (30%) on any settlement effected after the initiation of the lawsuit but made prior to any trial or trials.

\* \* \* \* \* \*

An integral part of our settlement with Cannelton and Laxare was accomplished by agreeing to a new lease for your one-half interest in the property with Laxare, which has been subleased to Boone East Development, and a Licensing Agreement with Cannelton in connection with the preparation plant. Under the new lease, your share of the minimum royalty has been increased from Six Thousand Dollars ($6,000.00) per year to Thirty Thousand Dollars ($30,000.00) per year, or an increase of Twenty–Four Thousand Dollars ($24,000.00) per year as long as the lease remains in effect. [Details of tonnage royalties].

\* \* \* \* \* \*

All of these amounts are speculative and we do not know what amount of actual dollars you may receive by virtue of these new agreements. Therefore, during our conversation on March 30, we concluded that the best way to handle these amounts would be to do so on the basis that our thirty percent (30%) contingent fee would be due and payable when these amounts are actually received.

Second, a time entry of Ray A. Byrd of SBC for March 30, 1998 states:

Telephone conference with Bill Luther and Kitty Marks regarding contingent fee contract; preparation of a statement and attempting to get instructions for wire transfer of funds for the closing on Friday; all parties agree that the increases negotiated in connection with tonnage royalty, annual minimums, wheelage or processing fees cannot be projected with any accuracy and any fees due on those amounts will be paid on an annual basis as received; continued to work on documents and review of matters for closing on Friday.

No evidence has been proffered showing that at the time of settlement either of the sisters or their representatives expressed any reservations about paying SBC 30% of the increase in future coal royalties that was gained as a result of the litigation settlement.

One of SBC's clients, Ms. Luther, did submit an affidavit in response to SBC's motion for summary judgment. However, her affi-

davit does not specify what her understanding was in 1988, when she entered into the representation agreement; or in 1998, at the time of the settlement agreement. In the affidavit, Ms. Luther indicates that she relied on her husband to deal with SBC; and that in 1998 her husband did not express any objection to SBC's receiving a percentage of the increase in future royalties, because he accepted SBC's representation that such payments were consistent with the original retainer agreement.

Thirty percent of the increase in royalties agreed to as part of the settlement has been paid on an ongoing basis to SBC since 1998, as coal has been mined from the property. From April 1998 through September 15, 2004, Ms. Luther and/or Ms. Marks and/or her heirs paid to SBC approximately $83,761.53. Since the Garner Williams litigation settled on April 3, 1998, SBC has additionally spent approximately 152.35 lawyer hours and 51.55 paralegal hours on issues related to the Garner Williams litigation.

In granting SBC's motion for summary judgment, the circuit court found that SBC's attorneys' fees, in the form of a percentage of the increase in ongoing royalties, are "not excessive," and that SBC "has shown the reasonableness and fairness of the contract for attorneys' fees." The circuit court found that "the average hourly rates calculated to be $260.00 per hour for lawyers and $100.00 per hour for paralegals [are not] excessive for the skill and labor required in this case." The circuit court also found that "the instant case had a significant degree of risk. The chance that plaintiff would not prevail was very real.... Even after the settlement, the value of the recovery and the fee were uncertain because it was contingent on the price of coal, whether anyone would mine it, and the amount of usage that would take place." The circuit court found that there was no second or separate attorney fee contract at the time of settlement, nor was there a modification of the original contingency fee contract. Rather, the court concluded, the payment of attorney fees from the ongoing future royalties was consistent with the original fee agreement.

## II.

### *Standard of Review*

■ We review a circuit court's grant of summary judgment *de novo*. Syllabus Point 1, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994).

## III.

### *Discussion*

The appellants challenge the circuit court's decision with the following succinct argument: "Ms. Marks and Ms. Luther did not intend to make the law firm a 30% owner of the property, a partner in their business, or a member of the family." In other words, the appellants argue that a fee payment arrangement whereby SBC receives a percentage of the appellants' increased coal royalties, as they are earned, improperly places SBC in the status of a co-owner of the Boone County mineral property.

The appellants also argue that circuit court erred in granting SBC's motion for summary judgment because there were genuine issues of material fact: (1) as to whether the future royalty agreement fell within the ambit of the original contingent fee agreement, or was a modification of that agreement; and (2), if it was a modification, whether SBC provided sufficient disclosure to its clients in connection with the modification; and (3), whether SBC's fees from future royalties are reasonable or excessive.

SBC counters and says that having its fees paid from future royalty revenue is not impermissible. SBC denies that such an arrangement gives SBC the status of a family member, co-owner of the property, or business partner with the appellants.

■ Our research indicates that fee payment arrangements whereby the attorney receives a portion of future income to the client do not inherently create an impermissible relationship or entanglement between the attorney and client. *See Shiya v. National Committee of Gibran*, 381 F.2d 602, 607–608 (2d Cir.1967) ("[t]he prize sought in the litigation ... was the full fruits of the renewal copyrights.... The subject of the litigation was all the renewal royalties, not simply

those 'frozen' at the termination of the [litigation];" affirming judgment that contingent fee applied to future royalties).

As one commentator has stated:

Where an attorney's efforts result in the client becoming entitled to future payments, such as periodic payments under a disability policy or future royalties, courts have held that under the particular fee agreement at issue the attorney was entitled to his contingency percentage on such future payments in addition to a percentage of any current sum recovered.

Robert L. Rossi, Attorneys' Fees, Sec. 2:11 (citing cases), West Publications 2002. *See also Cardenas v. Ramsey County,* 322 N.W.2d 191 (Minn.1982) (attorney entitled to receive one-third of each payment received by his client under settlement as and when client receives it); *see also Rosenfeld, Meyer & Susman v. Cohen,* 191 Cal.App.3d 1035, 1044–1045, 237 Cal.Rptr. 14, 19 (1987) (fees are calculated as a share of clients' future income on entertainment projects negotiated by the law firm); *see also Waugh v. Q. & C. Co.,* 16 F.2d 363 (7th Cir.1926) (attorney was entitled to receive percentage of future royalties received as a result of settlement of patent litigation).[3]

■ Based on the foregoing discussion, we hold that an attorney fee payment arrangement whereby the attorney receives a percentage of funds as they are periodically received by the attorney's client is not, as such, either suspect or impermissible. Factors to be considered in determining an attorney's entitlement to receive fees in such a fashion include: (1) the terms of the fee agreement between the attorney and the client; and (2) whether, when viewed in the context of the entire representation of the client by the attorney, the fees are fair and reasonable. Applying this test in the instant case, we conclude that the circuit court did not err in concluding that the fees-from-

future-royalties arrangement was not *per se* impermissible.

We also cannot agree with the appellants that summary judgment was improper in the instant case. Whether the fees-from-future-royalties arrangement was or was not a modification of the original retainer agreement, and whether the fees in question are reasonable or excessive, are not disputed *factual* issues. The facts of the instant case are essentially undisputed, and the dispositive questions are the legal characterizations of the fees-from-future-royalties payment arrangement.

■ Looking to those undisputed facts, and specifically to the relevant documents, the 1998 lease document recites that it is "part of the complete compromise and settlement of all claims by Marks, Luther, Laxare and Cannelton." Clearly, then, the increase in future royalty payments is properly characterized as an integral part of the 1998 settlement.

Additionally, the original retainer agreement said that SBC's fee would be "30% of the amount collected" as the result of a settlement. The agreement did *not* say "collected and paid at the time of settlement." Thus, the retainer agreement did not preclude an arrangement whereby a portion of the fee would be paid from money resulting from the settlement, but collected at a future time. The fees-from-future-royalties agreement is entirely consistent with the original fee agreement.

Our review of the history of the Garner Williams litigation leads us to conclude that the circuit court did not err in finding that the portion-of-fees-from-future-royalties arrangement is consistent and congruent with the understanding and objectives of both SBC and its clients before the litigation began, and in concluding that there was no substantive modification of the original fee agreement.[4]

---

**3.** Moreover, the fact that an attorney has a right to a percentage of a settlement does not make the attorney a cotenant of the cause of action. *See Commissioner v. Banks,* 543 U.S. 426, 125 S.Ct. 826, 160 L.Ed.2d 859 (2005) (holding that the entirety of litigation settlement proceeds was tax-

able income to client, not net after payment of attorney fees).

**4.** That being the case, it is not necessary to decide whether SBC "fully informed" their clients about the details of a proposed modification of the fee agreement, and gave their clients

As to the amount of fees received so far by SBC, the circuit court found that the fees have been reasonable, and we agree. As to the amount of fees possibly to be collected in the future by SBC, the appellants argue that the amount could at some time in the future be so "huge" as to be facially outrageous. However, the appellants did not and do not support this speculation with any evidence— and consequently, this argument is without merit.[5]

### IV.

#### Conclusion

We conclude that the circuit court did not err in granting summary judgment for SBC. The circuit court's order is affirmed.

Affirmed.

MAYNARD, Justice, dissenting.

I would reverse the circuit court's award of summary judgment on behalf of SBC because I believe there is a question of fact regarding whether Ms. Marks and Ms. Luther understood the nature of the contingent fee agreement as it related to the execution of the new lease.

At the outset, I wish to make clear that I find nothing improper with the fact that SBC received one-third of the $3.5 million that Ms. Marks and Ms. Luther received which amounted to $1,050,000.00. SBC expended thousands of lawyer and paralegal hours on the litigation and was very effective in achieving a desirable result for Ms. Marks and Ms. Luther. Certainly, lawyers should be well compensated for their expertise and hard work. However, I believe that SBC's work on the new lease must be judged separately from the original contingent fee arrangement.

Under our law, "The fundamentals of a legal contract are competent parties, legal subject matter, valuable consideration and mutual assent. There can be no contract if there is one of these essential elements upon which the minds of the parties are not in agreement." Syllabus Point 5, *Virginian Export Coal Co. v. Rowland Land Co.*, 100 W.Va. 559, 131 S.E. 253 (1926). There is evidence below that Ms. Marks and Ms. Lu-

---

an opportunity to reject SBC's proposal for modification.

The appellants also argue that the circuit court should have applied Syllabus Point 2 of *Committee on Legal Ethics v. Tatterson*, 177 W.Va. 356, 352 S.E.2d 107 (1986) to hold that the fees-from-royalties arrangement was improper. Syllabus Point 2 of *Tatterson* states:

> If an attorney's fee is grossly disproportionate to the services rendered and is charged to a client who lacks full information about all of the relevant circumstances, the fee is "clearly excessive" within the meaning of Disciplinary Rule 2–106(A), even though the client has consented to such fee. The burden of proof is upon the attorney to show the reasonableness and fairness of the contract for the attorney's fee.

In the instant case, the circuit court concluded that the challenged fee payment arrangement did not result in a fee for SBC in the Garner Williams litigation that is grossly disproportionate to the services rendered by SBC. The appellants offered expert opinion that the per-hour calculated compensation for the time spent by SBC *after* the settlement agreement was signed was excessive. But that opinion misses the point—that SBC's post-settlement percentage-of-royalty fees are part of SBC's compensation for its work in the *entire* Garner Williams litigation, and not a separate fee for post-settlement work. We find no error in the circuit court's analysis.

**5.** The appellants were free to tell the circuit court, for example, the range of estimated recoverable tons of coal remaining to be mined on the property. From such figures, the appellants (perhaps) could have made the argument that SBC's fee might become outrageously high at some point in the future. But the appellants did not do so. The circuit court did not rule out the possibility that at sometime in the future the fees-from-royalties payments could conceivably be so high as to be impermissible; nor do we address that issue, having no basis upon which to ground such a discussion. The appellants point out that the new lease and side letter agreement that were agreed to as part of the settlement are at market rate, and therefore can be seen as including no payment for "past" damages to the appellants. However, the issue is not whether the new lease and side letter agreement are at market rate, but whether SBC successfully removed Ms. Marks and Ms. Luther from the less favorable terms of the 1968 lease and placed them into a lease and agreement with more favorable terms. Moreover, Ms. Marks' and Ms. Luther's agreement to accept a reduced lump sum payment plus a new lease caused SBC to forego possibly collecting 30% of $15–50 million dollars in damages (and possibly 30% of $59 million to in excess of $200 million in damages, depending upon a finding of intentional trespass and treble damages) under the contingency fee contract.

ther simply did not assent to paying SBC 30% of the increase in all future royalty payments.

Further, "courts as a matter of public policy give particular scrutiny to fee arrangements between attorneys and clients, casting the burden on attorneys who have drafted the retainer agreements to show that the contracts are fair, reasonable, and fully known and understood by their clients." *Shaw v. Manufacturers Hanover Trust Co.*, 68 N.Y.2d 172, 176, 499 N.E.2d 864, 866, 507 N.Y.S.2d 610, 612 (1986) (citations omitted). Unfortunately, neither the circuit court nor a majority of this Court gave careful scrutiny to the fee arrangement at issue. SBC should have the burden of proving to the trier of fact that the fee agreement is fair, reasonable, and actually what the parties agreed to. Considering the highly unusual nature of the fee agreement and its potential for the payment of sizable fees to SBC, I believe that the burden of proof on SBC's part would be a heavy one.

Finally, I firmly believe that fee arrangements like the one at issue should not be encouraged by this Court. May we never see the day when lawyers who negotiate leases on behalf of Wal–Mart receive compensation in the form of 5% of that store's future earnings. Such a practice would unduly entangle lawyers in the affairs of their clients and arguably give these lawyers an ownership interest in the businesses they represent, all to the detriment of the legal profession.

Accordingly, for the reasons set forth above, I dissent.

ALBRIGHT, Justice, concurring.

I write separately to concur with the majority's holding that an attorney fee arrangement in which a percentage of future client income is paid as an attorney fee is not per se impermissible. The factors articulated by the majority opinion for determining the reasonableness of such arrangement in any given case are, in my opinion, properly formulated to protect the interests of both the attorney and the client.

The dissents of Justice Maynard and Justice Benjamin raise the issue of the clients' comprehension of the nature of the agreement with their attorneys in this case. A review of the evidence of record reveals that Ms. Luther and Ms. Marks were adequately informed of the scope of the contingent fee agreement. The evidence further indicates that the application of that agreement to the portion of the settlement which created an increase in future royalty payments was also sufficiently discussed.

When it became apparent that the settlement would include both an immediate payment and the right to an increase in future payments, the parties attempted to ascertain the most appropriate manner in which the thirty percent contingency fee could be applied to the amount of increase in future payments. The March 30, 1998, discussion of this issue was memorialized in a March 31, 1998, letter from one of the attorneys to the clients. The letter specifically invited alterations, where necessary, stating as follows: "[I]f I have misstated anything or if you have a different recollection, please let me know as soon as possible." The clients did not immediately assert any allegation of misrepresentation, concealment, or misconception regarding the application of the thirty percent contingency fee to the future payments. In fact, pursuant to that arrangement, the clients paid the attorneys thirty percent of the increase in royalty payments from April 1998 to September 2004.

In the summary judgment action below, the circuit court was presented with the question of whether a genuine issue of material fact existed regarding the agreement and its consummation. This Court has consistently emphasized the obligation of attorneys to deal with clients in utmost good faith. Yet, it is not within the authority of this Court to alter the terms or conditions of an attorney-client agreement by eliminating portions which are not within the liking of this Court. "The relationship of attorney and client is a matter of contract, expressed or implied." *State ex rel. DeFrances v. Bedell*, 191 W.Va. 513, 517, 446 S.E.2d 906, 910 (1994).

The attorneys in this case filed a motion for summary judgment, properly granted by the lower court. Syllabus point five of *Wilkinson v. Searls*, 155 W.Va. 475, 184 S.E.2d 735 (1971), explains:

A motion for summary judgment should be granted if the pleadings, exhibits and discovery depositions upon which the motion is submitted for decision disclose that the case involves no genuine issue as to any material fact and that the party who made the motion is entitled to a judgment as a matter of law.

Syllabus point three of *Williams v. Precision Coil, Inc.*, 194 W.Va. 52, 459 S.E.2d 329 (1995), enumerates the responsibilities of the responding party, as follows:

If the moving party makes a properly supported motion for summary judgment and can show by affirmative evidence that there is no genuine issue of a material fact, the burden of production shifts to the non-moving party who must either (1) rehabilitate the evidence attacked by the moving party, (2) produce additional evidence showing the existence of a genuine issue for trial, or (3) submit an affidavit explaining why further discovery is necessary as provided in Rule 56(f) of the West Virginia Rules of Civil Procedure.

*See also Aluise v. Nationwide Mut. Fire Ins. Co.*, 218 W.Va. 498, 509, 625 S.E.2d 260, 271 (2005). The evidence asserted by the clients in this case was insufficient to create a genuine issue of material fact regarding their lack of understanding or consent to the contingency fee arrangement's application to the future increase in royalties. Thus, the lower court was correct in granting summary judgment to the attorneys.

Based upon the foregoing, I respectfully concur.

BENJAMIN, Justice, dissenting.

The Majority affirmed the circuit court's finding of summary judgment based upon the Majority's conclusion that the fees-from-future-royalties arrangement was not *per se* impermissible. In so doing, the Majority established a factor test to determine whether an attorney is entitled to receive fees through such an arrangement. The first factor is the consideration of whether the terms of the fee agreement between the attorney and client provide for a fees-from-future-royalties arrangement. The second factor is "whether, when viewed in the context of the entire representation of the client by the attorney, the fees are fair and reasonable." I must disagree with the Majority's determination that the fee herein—even when analyzed under the Majority's own factor test—was either contemplated by the fee agreement or is "fair and reasonable."

I do not disagree that a fair contingent fee was the appropriate measure for the work of Shrader Byrd & Companion, P.L.L.C. (herein after "SBC") in settling the Garner Williams litigation and obtaining a settlement of $3.5 million dollars for Ms. Marks and Ms. Luther. I take issue, however, with the Majority's holding that such a contingent fee should be extended to future royalties gleaned from the preparation of a new lease which resulted during the settlement of the case.

The Majority relies on *Shiya v. National Committee of Gibran*, 381 F.2d 602, 607–608 (2d Cir.1967) to support its position. The *Shiya* court concluded that the somewhat ambiguous contingent fee agreement involved in the attorney-client relationship therein applied to renewal copyright royalties based on the unambiguous language of negotiations which tended to prove that the parties involved were aware that those renewal royalties were included in the subject matter of the litigation. Language such as "all sums involved or connected with the litigation," "requested thirty percent for his compensation of the monies that shall be adjudged to inure to the benefit of the committee" and "a fee equal to twenty-five percent of the total recovery" tended to support the court's conclusion therein that, in the negotiation of the contract, the parties understood that the contingent fee was applicable to all renewal royalties. The situation in *Shiya* is not, however, analogous to that in the case before us. .

The language of the contingent fee agreement executed between SBC and Ms. Marks and Ms. Luther makes clear that SBC was retained to recover:

loss of income and other damages sustained by Client as a result of the wrongful and improper mining of mineral property...in which Client owns an undivided interest, with this employment being on a contingent fee basis as follows:

> FIRST: In the event that a settlement is effected after the institution of an action or actions, but prior to trial or trials of said action or actions, then and in that event Client agrees to pay said attorneys 30% of the amount collected by any such settlement in each such action.

I cannot agree with the Majority that this contingent fee contract contemplated that the "amount collected by any such settlement" was meant to include future royalties when the agreement clearly states that it was executed in regard to action for "loss of income" resulting from the "wrongful and improper mining of mineral property." Future royalties based upon lawful and authorized mining of mineral property are not "lost income" from "wrongful and improper mining." On the contrary, future royalties are income yet to be realized.

To support its contention that the future royalties provided for in the 1998 lease are part of the "amount collected by [the] settlement" and subject to the contingent fee agreement, the Majority focuses on the fact that the 1998 lease itself states that the lease is "part of the complete compromise and settlement of all claims by Marks, Luther, Laxare and Cannelton." However, this language is irrelevant to the question of what the contingent fee agreement contemplated. The contingent fee agreement only contemplated that SBC would be entitled to thirty percent of whatever lost income and other damages were collected in the settlement of the dispute. While the new lease was drafted and executed as a necessary part of the settlement (which found that Ms. Marks and Ms. Luther were not bound by the prior lease) it has little or nothing to do with the loss of income and other damages that Ms. Marks and Ms. Luther suffered while their mineral rights were robbed under the old lease.

That is not to say that SBC should be left uncompensated for its work in the preparation of the lease. However, I find it unconscionable to allow SBC to collect what will surely amount to millions of dollars over the years for the simple act of preparing a mineral lease. Had SBC simply billed Ms. Marks and Ms. Luther for a multi-million dollar lump-sum fee for the preparation of the lease, the circuit court and this Court surely would have disapproved. Can it justly be said that a legal fee which will, over time, amount to millions of dollars for the simple preparation of a mineral lease can be justified simply by calling it part of a contingent fee agreement or simply because Ms. Marks and Ms. Luther acquiesced to it for a period of time? I think not.

In *Committee on Legal Ethics of West Virginia State Bar v. Tatterson*, 177 W.Va. 356, 352 S.E.2d 107 (1986), this Court held in Syllabus Point 2:

> If an attorney's fee is grossly disproportionate to the services rendered and is charged to a client who lacks full information about all of the relevant circumstances, the fee is "clearly excessive" within the meaning of Disciplinary Rule 2–106(A), even though the client has consented to such fee. The burden of proof is upon the attorney to show the reasonableness and fairness of the contract for the attorney's fee.

Moreover, in Syllabus Point 3, the Court held, "In the absence of any real risk, an attorney's purportedly contingent fee which is grossly disproportionate to the amount of work required is a 'clearly excessive fee' within the meaning of Disciplinary Rule 2–106(A)." I can find nothing in the record that would lead me to believe that when the contingent fee agreement was executed in 1988, Ms. Marks and Ms. Luther had any sort of understanding that the contingent fee would be based on anything more than recovery of their loss of income and other attendant damages. There is nothing that would lead me to believe that Ms. Marks and Ms. Luther intended to obligate themselves to give SBC thirty percent of any and all future royalties.

Likewise, I do not find any "real risk," such that might support an otherwise unreasonable fee, which would justify SBC's collec-

tion of thirty percent of future royalties. The preparation of the lease itself proposed no real risk to SBC, and certainly there is no current risk to the law firm now that the lease has been executed. Furthermore, SBC admits in its brief that it has only spent approximately "52.35 lawyer hours and 51.55 paralegal hours on issues related to the Garner Williams litigation (including the Lease and side letter agreement)" since the settlement as opposed to the approximately 4,062.45 lawyer hours and 920.35 paralegal hours alleged to have been spent prior to the settlement. I think one may rightly assume that SBC has probably spent even less time—if any—on issues related to the Garner Williams litigation since the submission of that brief. Indeed, SBC's only apparent job at this point is to sit back and watch the checks roll in.

Suffice it to say, I find that the contingent fee herein as applied to future royalties resulting from the preparation of the new lease to be grossly disproportionate and clearly excessive in light of *Tatterson.* I also find— in light of the Majority's new factor test— that the terms of the contingent fee agreement do not contemplate that the fee would be applied to future royalties and that it is unfair and unreasonable to apply the fee to such future royalties. Accordingly, I respectfully dissent from the Majority opinion.